

Priority ✓
Send ✓
Clsd
Enter ✓
JS-5/JS-6
JS-2/JS-3
Scan Only

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORTHROP GRUMMAN CORPORATION, | Case No. CV 05-08444 DDP (PLAx) |
| Plaintiff, | **ORDER GRANTING NORTHROP'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING FACTORY MUTUAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| FACTORY MUTUAL INSURANCE COMPANY, | [Motions filed on March 19, 2007] |
| Defendant. | |

Plaintiff Northrop Grumman Corporation ("Northrop") and Defendant Factory Mutual Insurance Company ("Factory Mutual") each seek partial summary judgment on the issue of whether the 2005-2006 excess insurance policy that Factory Mutual sold to Northrop covers Northrop's storm surge loss caused by Hurricane Katrina. After reviewing the papers submitted by the parties, the Court grants Northrop's motion, denies Factory Mutual's motion and adopts the following order.

## I.   STATEMENT OF FACTS[1]

Northrop is a global defense and technology company that provides a broad array of innovative systems, products, and solutions in information and services, electronics, aerospace, and shipbuilding to government and commercial customers worldwide. Northrop is a Delaware corporation with its principal place of business in Los Angeles, California.  Northrop's Mississippi subsidiary, Northrop Grumman Ship Systems ("NGSS"), is a shipbuilder headquartered in Pascagoula, Mississippi.

Factory Mutual is a Rhode Island corporation with its principal place of business in Rhode Island.  Factory Mutual is authorized to transact business in the County of Los Angeles and the State of California.

This litigation centers upon Northrop's 2005-2006 property insurance.  Northrop employs AON Risk Services of Southern California ("AON") to represent its needs in the insurance market. To obtain property insurance for Northrop for the 2005-2006 policy year, AON submitted a proposal to the insurance market.   The proposal specified details of the coverages and sub-limits that Northrop wanted to purchase.  It requested a sub-limit of "$400 million per occurrence and in the Annual Aggregate as respects Flood."   The proposal also contained a "suggested layering," describing the primary layer(s) as "All risk including earthquake, flood & boiler & machinery," and the excess layer as "All Risk Including Boiler & Machinery (Excluding Earthquake and Flood)." AON's suggested premium for the primary $500 million totaled

---

[1]   The Court understands these facts to be undisputed.

$12,730,000.  The suggested premium for the excess layer was $950,000.[2]

In response to AON's submission, Factory Mutual provided a quote for the 2005-2006 property renewal for its 15% participation in the first $100 million of coverage, and "Blanket limit" participation excess of $500 million, "subject to applicable policy sub-limits."  Factory Mutual's quote reflected the sub-limits that AON requested, including the $400 million sub-limit for Flood.

Northrop, through AON, accepted Factory Mutual's quote and, on March 31, 2005, Factory Mutual transmitted its primary and excess policies to AON.  The Primary Policy no. UB270 participated 15% in the first $100 million of coverage and expressly provided coverage for Flood, subject to all other Policy terms, conditions, and exclusions.[3]  The Excess Policy no. UB276 provided the remaining $19.8 billion in blanket coverage limits.

The Primary Policy defines and covers the separate perils of "Flood," "Wind," and "Named Windstorm."  Flood is defined in the Primary Policy as:

> [F]lood waters, rising waters, waves, tide or tidal water,
> surface waters, or the rising, overflowing, or breaking of
> boundaries of lakes, reservoirs, rivers, streams or other
> bodies of water, <u>whether driven by wind or not</u>, including
> spray  and  sewer  back-up  resulting  from  any  of  the

---

[2]  Neither party submitted any evidence indicating whether these suggested premiums were typical for this insurance market.

[3]  Factory Mutual has paid its $15 million limit under the primary policy and Northrop has not sued under that policy.

1   foregoing, all regardless of any other cause or event
2   contributing concurrently or in any other sequence of loss
3   (emphasis added).  Wind is defined in the Primary Policy as the
4   "[d]irect action of wind including substance driven by wind."
5   "Named Windstorm" is defined as:

> The direct action of wind including any substance driven by
> wind, and/or flood when such wind or flood is associated
> with or occurs in conjunction with a storm or weather
> disturbance which is identified by name prior to loss by
> any meteorological authority such as the U.S. National
> Weather Service or National Hurricane Center.

12   The Primary Policy contains a $10 million per occurrence
13  deductible for loss or damage caused by "Named Windstorm" at the
14  Mississippi and Avondale, Louisiana locations.

15   The Excess Policy does not repeat the Primary Policy's
16  definitions of Named Windstorm or Wind, nor does it exclude
17  coverage for losses caused by either peril.  The Excess Policy
18  does, however, contain the following Flood Exclusion:

> Flood; surface waters; rising waters; waves; tide or tidal
> water; the release of water, the rising, overflowing or
> breaking of boundaries of natural or man-made bodies of
> water; or the spray therefrom; or sewer back-up resulting
> from any of the foregoing; regardless of any other cause or
> event contributing concurrently or in any other sequence of
> loss.

26   On August 29, 2005, Hurricane Katrina struck the U.S. Gulf
27  Coast, making landfall near the Louisiana/Mississippi border.
28  NGSS/Northrop sustained property damage from Hurricane Katrina at

4

1  three separate facilities.   The storm surge from Hurricane Katrina

2  was a significant cause of the damage.

3      Northrop claimed coverage for its losses under the Primary

4  Policy and the Excess Policy.   Factory Mutual rejected coverage for

5  a substantial part of Northrop's loss, asserting that the Flood

6  Exclusion in the Excess Policy bars coverage for losses caused by

7  Hurricane Katrina's wind-driven storm surge.   Both parties now move

8  for summary judgment on this issue - the sole issue presented in

9  Phase I[4] of this litigation.

10

11 **II.   LEGAL STANDARD**

12      Under the Federal Rules of Civil Procedure 56(c), summary

13 judgment is proper only where "the pleadings, depositions, answers

14 to interrogatories, and admissions on file, together with the

15 affidavits, if any, show that there is no genuine issue as to any

16 material fact and that the moving party is entitled to a judgment

17 as a matter of law."   Fed. R. Civ. P. 56.   The moving party has the

18 burden of demonstrating the absence of a genuine issue of fact for

19 trial.   See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

20 (1986).   If the moving party satisfies the burden, the party

21 opposing the motion must set forth specific facts showing that

22 there remains a genuine issue for trial.   See id.; Fed. R. Civ. P.

23 56(e).

24      A non-moving party who bears the burden of proof at trial to

25 an element essential to its case must make a showing sufficient to

26

27      [4]  Phase I is limited to "issues regarding contract
   interpretation, including any purported admissions of the parties."
28 (Stip. & Order Regarding Scheduling for Phase I, May 26, 2006.)

1 establish a genuine dispute of fact with respect to the existence

2 of that element of the case or be subject to summary judgment. See

3 Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Such an issue

4 of fact is a genuine issue if it reasonably can be resolved in

5 favor of either party.  See Anderson, 477 U.S. at 250-51.  The non-

6 movant's burden to demonstrate a genuine issue of material fact

7 increases when the factual context renders her claim implausible.

8 See Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475

9 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).  Thus, mere

10 disagreement of the bald assertion that a genuine issue of material

11 fact exists, no longer precludes the use of summary judgment.  See

12 Harper v. Wallingform, 877 F.2d 728 (9th Cir. 1989); California

13 Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.,

14 818 F.2d 1466, 1468 (9th Cir. 1987), cert. denied, 484 U.S. 1006

15 (1988).

16

17 **III. CHOICE OF LAW**

18      As an initial matter, the Court must determine whether

19 California law should apply to this insurance contract dispute.

20 Choice-of-law rules are "substantive" for purposes of diversity

21 jurisdiction.  Federal courts sitting in diversity must apply the

22 same choice-of-law rules that local courts would apply.  Klaxon Co.

23 v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).

24      California resolves choice-of-law questions using a

25 "governmental interest analysis" to find the proper law to apply

26 based upon the interests of the litigants and the involved states.

27 Offshore Rental Co. v. Continental Oil Co., 22 Cal.3d 157, 161

28 (1978) (quotation omitted).  California applies its own rule of

1  decision unless a party litigant properly invokes the law of a

2  foreign state.  A party advocating application of foreign law must

3  demonstrate that the [foreign] rule of decision will further the

4  interest of that foreign state and, therefore, that it is an

5  appropriate one for the forum to apply to the case before it."

6  Hurtado v. Super. Ct., 11 Cal. 3d 574, 581 (1974); see Liew v.

7  Official Receiver and Liquidator, 685 F.2d 1192, 1197 (9th Cir.

8  1982).

9      Factory Mutual does not perceive that a conflict of laws

10 exists between the states of California and Mississippi on the

11 issues presented.  However, Factory Mutual has indicated that if

12 the Court determines that an actual conflict of law exists, it will

13 offer additional briefing on this issue at the Court's request.

14     As indicated above, the burden of finding a conflict between

15 Mississippi and California law does not rest with the Court.  The

16 Court is not aware of any conflict between the two states' contract

17 interpretation laws that would affect its analysis of these

18 motions.  Accordingly, the Court will apply the California rules of

19 contract interpretation to these motions.

20

21 **IV.   CONTRACT INTERPRETATION**

22     Under statutory rules of contract interpretation, the mutual

23 intention of the parties at the time the contract is formed governs

24 interpretation.  Cal. Civ. Code. § 1636; AIU Ins. Co. v. Super.

25 Ct., 51 Cal. 3d 807, 821 (1990).  Such intent is to be inferred, if

26 possible, solely from the written provisions of the contract.  Id.

27 § 1639.  The clear and explicit meaning of these provisions,

28 interpreted in their ordinary and popular sense, unless used by the

7

1  parties in a technical sense or a special meaning is given to them

2  by usage, controls judicial interpretation.  _Id._ § 1644.

3      If the Court finds that a policy provision is capable of two

4  or more constructions – i.e., if the provision lacks a "clear and

5  explicit meaning" – it must interpret the contract "as a whole" to

6  determine which construction reflects the mutual intention of the

7  parties at the time of formation.  _Bank of the West v. Super. Ct._,

8  2 Cal. 4th 1254, 1265 (1992).  The burden is on the insured to

9  establish that its claim is within the basic scope of coverage and

10 on the insurer to establish that the claim is specifically

11 excluded.  _MacKinnon v. Truck Ins. Exchange_, 31 Cal. 4th 635, 648

12 (2003).  Stated differently, a court that is faced with an argument

13 for coverage based on assertedly ambiguous policy language must

14 first attempt to determine whether coverage is consistent with the

15 insured's objectively reasonable expectations.  _Bank of the West_, 2

16 Cal. 4th at 1265.  In so doing, the Court must interpret the

17 language in context, with regard to its intended function in the

18 policy.[5]  _Id._

19      Furthermore, the Ninth Circuit has observed that while the

20 rule of contract interpretation applying to coverage provisions

21

22      [5]  Northrop argues that once the Court determines that the
   language is capable of two or more constructions, it must rule in
23 Northrop's favor.  However, this argument omits an important step
   in contract interpretation:  the Court must still determine whether
24 Northrop's construction is consistent with Northrop's objectively
   reasonable expectation of coverage at the time of contract
25 formation.  Only after finding that Northrop's construction is
   reasonable under the circumstances of the case may the Court
26 resolve any ambiguity in Northrop's favor.  _Bank of the West_, 2
   Cal. 4th 1254, 1265 ("[L]anguage in a contract must be construed in
27 the context of that instrument as a whole, and in the circumstances
   of that case, and cannot be found ambiguous in the abstract.").
28

8

1   "favors the insured over the insurer," the contract interpretation

2   rule applicable to exclusions is "substantially" even more

3   stringent.  <u>PMI Mortgage Ins. Co. v. Am. Int'l Specialty Lines Ins.</u>

4   <u>Co.</u>, 394 F.3d 761, 765 n.5 (9th Cir. 2005); <u>see</u> <u>also</u> <u>Zurich Ins.</u>

5   <u>Co. v. Smart & Final Inc.</u>, 996 F. Supp. 979, 987 (C.D. Cal. 1998)

6   (special rules apply to policy exclusions).

7        "[Whereas], insurance coverage is interpreted broadly so as

8        to afford the greatest possible protection to the insured,

9        . . . exclusionary clauses are interpreted narrowly against

10       the insurer.  An insurer cannot escape its basic duty to

11       insure by means of an exclusionary clause that is unclear.

12       As we have declared time and again any exception to the

13       performance of the basic underlying obligation must be so

14       stated as clearly to apprise the insured of its effect.

15       Thus,  the  burden  rests  upon  the  insurer  to  phrase

16       exceptions  and  exclusions  in  clear  and  unmistakable

17       language.  The exclusionary clause must be <u>conspicuous,</u>

18       <u>plain and clear.</u>"

19  <u>MacKinnon</u>, 31 Cal. 4th at 648 (citations omitted).

20       If, after considering the overall circumstances of the case,

21  the Court determines that the insured's construction is reasonable,

22  the Court will construe the ambiguous language against the party

23  who caused the uncertainty to exist.  <u>AIU</u>, 51 Cal. 3d at 822; <u>see</u>

24  <u>also</u> <u>MacKinnon</u>, 31 Cal. 4th at 655 (reasoning that even if an

25  insurer's interpretation of a policy exclusion is reasonable, if

26  the insured's interpretation is at least as reasonable, that

27  interpretation will govern).  This party is typically the insurer;

28  because the insurer writes the policy, it is held responsible for

9

1  ambiguous policy language, which is therefore construed in favor of

2  coverage.  _Id._  However, where the policy holder does not suffer

3  from lack of legal sophistication or a relative lack of bargaining

4  power, and where it is clear that an insurance policy was actually

5  negotiated and jointly drafted, courts need not go so far in

6  protecting the insured from ambiguous or highly technical drafting.

7  _Id._ at 823.

8

9  **IV.   WHETHER THE PLAIN LANGUAGE OF THE EXCESS POLICY EXCLUDES**

10     **DAMAGE FROM STORM SURGES**

11     It is undisputed that the Excess Policy explicitly excludes

12 coverage for Flood damage.  The question presented is whether the

13 plain language of the Excess Policy requires the Court to find that

14 the Flood exclusion encompasses "storm surge."

15     The term "Flood" is defined in the Excess Policy as follows:

16     Flood; surface waters; rising waters; waves; tide or tidal

17     water; the release of water, the rising, overflowing or

18     breaking of boundaries of natural or man-made bodies of

19     water; or the spray therefrom; or sewer back-up resulting

20     from any of the foregoing; regardless of any other cause or

21     event contributing concurrently or in any other sequence of

22     loss.

23     Factory Mutual argues that this Flood exclusion clearly and

24 explicitly encompasses losses caused by "storm surges."  First,

25 Factory Mutual contends that the ordinary meanings of both "flood"

26 and "storm surge" are "an inundation of water on normally dry

27

28

1  land."[6]  It also contends that the terms "rising water," "tide" or

2  "tidal water," and "the rising overflowing or breaking of

3  boundaries of natural or man-made bodies of water" – terms all

4  found within the Excess Policy's definition of Flood – describe a

5  "storm surge."  Factory Mutual points to the deposition excerpts of

6  several Northrop employees as evidence that laymen, as well as

7

8       [6]  Factory Mutual notes that the first term used to define
   Flood is "flood."  The <u>Oxford English Dictionary</u> defines "flood" as
9  "an overflowing or irruption of a great body of water over land not
   usually submerged; an inundation, a deluge."  5 <u>Oxford English</u>
10 <u>Dictionary</u> 1076 (2nd ed. 1989).  <u>Webster's Ninth New Collegiate</u>
   <u>Dictionary</u> defines "flood" as "a raising and overflowing of a body
11 of water esp. onto normally dry land."  <u>Webster's Ninth New</u>
   <u>Collegiate Dictionary</u> 474 (9th ed. 1988).  Thus, Factory Mutual
12 contends, the ordinary meaning of Flood can be discerned from
   reading the dictionary definition and heeding the term's common
13 usage.
        Factory Mutual also offers the testimony of Northrop and AON
14 executives – Curtis Anderson, AON's Managing Director of Property
   Claims, and Steve Pierce, Northrop's Manager of Risk Management –
15 whose personal interpretations reveal a common understanding of
   "flood" and "storm surge" as the inundation of normally dry areas
16 of land by water.  (Factory Mutual Ins. Co.'s Mem. of P. & A. in
   Supp. of it's Mot. for Partial Summ. J. ("FM Mot.") 15:6-11; Ex. 19
17 Curtis Anderson Dep. 73:14-21, 23-24, 74:5; Ex. 7 Steven Pierce
   Dep. 68:1-16, 71:15-25.)  Northrop, however, correctly objects to
18 the admissibility of this evidence because it is not indicative of
   the parties' intentions at the time of contracting.  <u>Nat'l Union</u>
19 <u>Fire Ins. Co. v. Lawyers' Mut. Ins. Co.</u>, 885 F. Supp. 202, 207
   (S.D. Cal. 1995) (sustaining an evidentiary objection where "the
20 documents themselves do not deal with evidence concerning the
   parties intention in formation of the policy, but rather post-
21 formation dealings between the insured and the carriers," and thus
   have "dubious relevance").  Therefore, the definitions provided by
22 English dictionaries and AON/Northrop executives are irrelevant.
        Factory Mutual further claims that there is no evidence that
23 at the time of contracting, the parties intended for these terms to
   be interpreted in any manner other than their "ordinary and popular
24 sense."  However, because these insurance policies are elaborate
   contracts negotiated and signed by sophisticated parties, it would
25 be reasonable for a party to believe the policy terms were being
   used in a technical manner.  Thus, Northrop could have disregarded
26 the various ordinary and popular meanings of the terms and,
   instead, relied strictly upon the definitions as they were written
27 in the contract.  If so, it would have been reasonable for Northrop
   to have assumed that the dissimilarities in the definitions created
28 an exclusion for flood caused by wind or hurricane.

                                   11

1  those in the insurance industry, would interpret these terms to

2  encompass "storm surge."[7]  Thus, Factory Mutual contends that

3  ───────────

4       [7]  Factory Mutual notes that AON representative Robert Hayes
    testified that storm surge is both "rising water" and "the rising
5  or overflowing or breaking of natural boundaries."    (FM Mot.
    15:16-17; Ex. 9 Robert Hayes Dep. pp. 120-122.)  Mr. Hayes also
6  testified that a named storm like Katrina can produce storm surge
    flooding.   (FM Mot. 15:17-18, 16:1; Ex. 9 Hayes Dep. 120:11-14.)
    Moreover, AON's Curtis Anderson testified that the terms "rising
7  water" and "the release of water, the rising, overflowing or
    breaking of boundaries of natural or man-made bodies of water" are
8  associated with "storm surge."  (FM Mot. 16:1-3; Ex. 19 Anderson
    Dep. pp. 75-79.)
9       Similarly, Northrop's Director of Risk Management Dean
    Reynolds testified that the terms "rising water," "tide" or "tidal
10  water," and "the rising, overflowing or breaking of boundaries of
    natural or man-made bodies of water" encompass or include "storm
11  surge."  (FM Mot. 16:4-7; Ex. 16 Dean Reynolds Dep. pp. 152-154.)
    Northrop's Manager of Risk Management Steve Pierce also testified
12  that "storm surge" could be considered "rising waters" and "waves."
    (FM Mot. 16:7-8; Ex. 7 Pierce Dep. pp. 68-69.)  Finally, Northrop's
13  Treasurer Jim Sanford, to whom Northrop's Risk Management
    department reports, wrote an e-mail well before Hurricane Katrina
14  occurred stating that "from a layman's perspective" hurricane storm
    surge is "flood."   (FM Mot. 16:9-11; Ex. 22 February 20, 2004 E-
15  Mail String.)
         However, various Northrop employees whose statements were
16  cited by Factory Mutual also contradicted these assertions.
    (Northrop's Opp'n p. 23-24.)  Northrop employee Dean Reynold's
17  30(b)(6) testimony states that in connection with the 2005 renewal
    process, he (1) reviewed the Underwriting Detail, and its
18  definition of "storm surge," and believed that storm surge was part
    of "Windstorm," and (2) received representations from AON that the
19  Factory Mutual Policies were all-risk policies that covered,
    without limitation, losses caused by Named Windstorm and Windstorm.
20  (Northrop's Mem. of P. & A. in Opp'n to Factory Mutual's Mot. for
    Partial Summ. J. "Northrop Opp'n" 23:17-24:6; CSOF ¶¶ 66, 68.)
21  Additionally, Factory Mutual omits Jim Sanford's testimony that
    Northrop "felt [it] had purchased windstorm coverage, including all
22  the property damage associated with windstorm."  (Northrop Opp'n
    24:7-10; CSOF ¶ 70.)   Factory Mutual also did not cite Northrop
23  employee David Strode's testimony that he "presumed that any loss
    arising our of a hurricane or a wind storm would be covered"
24  because the Excess Policy "was an all-risk policy and [he] didn't
    think there were any exclusions for hurricanes or a wind storm."
25  (Northrop Opp'n 24:11-14; CSOF ¶ 71.)  Mr. Pierce also made a
    statement that it "was [his] understanding, that [Northrop] had
26  full coverage for any loss related to hurricane damage."  (Northrop
    Opp'n 24:14-18; CSOF ¶ 69.)
27       AON's witnesses similarly testified that they believed the
    Factory Mutual Policies provided blanket limit coverage for loss
28                                                    (continued...)

1  because the definition of Flood as written in the Excess Policy

2  clearly encompasses the storm surge damage that occurred at

3  Pascagoula, the absence or omission of other words is entirely

4  inconsequential.

5      Factory Mutual further argues that the courts of Mississippi

6  and other jurisdictions where hurricanes occur treat wave action,

7  tidal water, tidal surge, rising water, and storm surge as "flood,"

8  which is typically excluded or limited under property insurance

9  policies.  (See Factory Mutual Mot. 16 n.63.)  Factory Mutual cites

10  this authority as additional evidence that the Flood exclusion in

11  the Excess policy is clear and unambiguous.

12      To understand whether "storm surge" is plainly encompassed by

13  the Excess Policy's Flood exclusion, the Court must first determine

14  the "ordinary and popular" meaning of this term.  This is not an

15  easy task; "storm surge" is not defined in the Excess or Primary

16  Policy and it is not a term with which the "lay" person is

17  typically familiar.  The National Hurricane Center offers the

18  following definition of storm surge:

19      Storm surge is simply water that is pushed toward the shore

20      by the force of the winds swirling around the storm.  This

21

22      [7]  (...continued)

23  caused by hurricanes, including loss caused by storm surge, because
the Factory Mutual Policies were all-risk policies and did not

24  exclude Named Windstorm.  (Northrop Opp'n 24:18-21; CSOF ¶¶ 73-76.)

25      In short, for every statement Factory Mutual uses to support
its conclusion that storm surge flooding was excluded in the Excess

26  Policy, Northrop cites other testimony indicating that Northrop
employees expected storm surge coverage under the all-risk policy.

27  Thus, although the statements do not provide the Court with a clear
indication of whether storm surge was actually excluded by the

28  Flood definition in the Excess Policy, the contradictory statements
demonstrate the ambiguity created by the inconsistent definitions.

1   advancing surge combines with the normal tides to create

2   the hurricane storm tide, which can increase the mean water

3   level 15 feet or more.  In addition, wind driven waves are

4   superimposed on the storm tide.  This rise in water level

5   can cause severe flooding in coastal areas, particularly

6   when the storm tide coincides with the normal high tides.[8]

7  Other authorities also state that "the main driver of storm surges

8  is the stress that the wind exerts on the water."  See Kerry

9  Emanuel, Divine Wind: The History and Science of Hurricanes 147

10  (2005).  These definitions characterize "storm surge" as  water

11  pushed by the wind that combines with the hurricane storm tide to

12  cause significant flooding.[9]  Thus, at first blush, it appears that

13  _____

14      [8]   The Court takes judicial notice of this definition, located
      at http://www.nhc.noaa.gov/HAW2/english/storm_surge.shtml.

15      [9]   Factory Mutual emphasizes that the federal government has
16  also defined "flood" broadly to encompass flooding from a hurricane
    event.  The terms "flood or flooding" as used in the regulations
17  governing the National Flood Insurance Program ("NFIP") are defined
    as "[a] general and temporary condition of partial or complete
18  inundation of two or more acres of normally dry land areas from . .
    . the overflow of inland or tidal waters."  National Flood
19  Insurance Program, Definitions, 44 C.F.R. § 59.1 (2001).
    Additionally, the FEMA Flood Insurance Study ("FIS") for the City
20  of Pascagoula, Mississippi states in Section 2.1 that its analysis
    "includes coastline flooding due to hurricane-induced storm surge."
21  (FM Mot. 18:16-18; Ex. F, Federal Emergency Management Agency,
    Flood Insurance Study, City of Pascagoula, Mississippi, Jackson
22  County 2 (1983) § 2.1.)  Section 2.3 of the FIS states, under the
    subheading "Principal Flood Problems," that "[c]oastal areas along
23  the Mississippi sound . . . are subject to coastal storm surge
    flooding and wave action as a result of hurricane and tropical
24  storm activity in the Gulf."  (FM Mot. 18:18-21; Ex. F § 2.3.)
        Conversely, Northrop notes that the Insurance Services
25  Office's ("ISO") standard property insurance form's "Water
    Exclusion" – which is comparable to a "flood exclusion – includes
26  the phrase "whether driven by wind or not."  (Notice of Northrop
    Grumman Corporation' Mot. for Partial Summ. J., and Mem. of P. & A.
27  in Supp. Thereof ("Northrop Mot.") 19:5-7.)  "ISO is a nonprofit
    trade association that provides rating, statistical, and actuarial
28  policy forms and related drafting services to approximately 3,000
                                              (continued...)

14

1  the Flood exclusion encompasses storm surges.  It also appears that

2  this interpretation would be consistent with a majority of the

3  Mississippi and Louisiana court decisions.[10]

4       However, there are significant problems with interpreting this

5  provision as clearly encompassing storm surge damage.  Because the

6  Excess Policy is undisputedly an "all risk" policy, "the limits of

7  coverage are defined by the exclusions."  Benavides v. State Farm

8  Gen. Ins. Co., 136 Cal. App. 4th 1241, 1247 (2006) ("An all-risk

9  policy covers risks of physical loss except those excluded under

10  the terms of the insuring contract.").  Accordingly, when

11  determining whether a claim is covered under an all risk policy,

12  "the insured does not have to prove that the peril proximately

13  causing his loss was covered by the policy.  This is because the

14  policy covers all risks save for those risks specifically excluded

15  by the policy."  Strubble v. United Serv. Auto. Ass'n, 35 Cal. App.

16  3d 498, 504-05 (1973).  Because "the burden rests upon the insurer

17  to phrase exceptions and exclusions in clear and unmistakable

18  language," the exclusionary clause in the Excess Policy "must be

19  conspicuous, plain and clear" to preclude coverage for storm surge

20

21       [9]  (...continued)
    nationwide property or casualty insurers.  Policy forms developed
    by ISO are approved by its constituent insurance carriers and then
22  submitted to state agencies for review."  Pardee Constr. Co. v.
    Ins. Co. of the West, 77 Cal. App. 4th 1340, 1358 n.15 (2000)
23  (citation and internal quotation marks omitted).
       Although these definitions demonstrate that hurricane storm
24  surge flooding may be defined with or without the words "whether
    driven by wind or not," the issue is not whether the Excess Policy
25  standing on its own excludes flood.  Rather, the issue is whether
    the inconsistent definitions of flood within the policies created
26  an ambiguity that led the parties to have different beliefs about
    storm surge flood coverage.  The Court finds that they did create
27  such ambiguity.

28       [10]  See, e.g., cases cited infra note 11.

1  damage.   Mackinnon, 31 Cal. 4th at 648, quoting Aydin Corp. v.

2  First State Ins. Co., 18 Cal. 4th 1183, 1188 (1998).

3      Here, none of the terms in the Excess Policy's Flood

4  definition plainly and clearly reference hurricanes or damage

5  caused by wind.   Though Factory Mutual asserts that the terms

6  "rising waters," "waves," "tide or tidal water," and "the

7  overflowing or breaking of boundaries of natural or man-made bodies

8  of water" - all terms included in the Excess Policy's Flood

9  definition - should be interpreted to encompass storm surge, none

10 of the terms expressly include wind-driven damage.   In fact, each

11 of those water events can be caused by phenomena other than wind,

12 which is a peril covered by "all risk" property policies such as

13 the Excess Policy.   This is exacerbated by the fact that the

14 Primary Policy's Flood definition contains the words "whether

15 driven by wind or not," the Excess Policy omits these clarifying

16 terms.   Given that a storm surge is a particular type of

17 "inundation of water" – an inundation caused, in part, by wind –

18 this omission creates ambiguity in the Excess Policy's Flood

19 exclusion.[11]

20     Moreover, as Northrop notes, the authority provided by Factory

21 Mutual does not alleviate the ambiguity inherent in the contract.

22 Specifically, Northrop argues that every case cited by Factory

23 Mutual either involved a flood exclusion that contained the words

24 "whether driven by wind or not" or did not address whether

25

26

27     [11]   See MacKinnon, 31 Cal. 4th at 648 ("A policy provision
   will be considered ambiguous when it is capable of two or more
28 constructions, both of which are reasonable.")

1  hurricane damage constitutes "flood" under an insurance policy."[12]

2  Although none of the cases discuss or reference the words "whether

3  driven by wind or not" as material to their conclusion that

4  flooding arising out of a hurricane is excluded, the absence of

5  that phrase in the Excess Policy lends support to Northrop's

6  argument that the omission of the phrase creates ambiguity.

7       Additionally, Northrop maintains that the definitions of Wind

8  and Named Windstorm in the Primary Policy control with respect to

9  the Excess Policy.  The Excess Policy does not separately define or

10  exclude Wind or Named Windstorm, yet Factory Mutual does not

11  dispute that Wind is a covered peril under the Excess Policy.

12  (Northrop Mot. 12:19-20; SOF ¶¶ 44-45.)  Similarly, Northrop

13  contends, because the perils of "wind and/or flood" in association

14  with a hurricane are redefined as the peril of Named Windstorm and

15

16       [12]  While Northrop claims that "in every case [Factory Mutual] cites that quotes a flood exclusion, the quoted exclusion contains
17  the words 'whether driven by wind or not' (or words to that effect)," only fifteen of the twenty-five cases actually refer to
18  the phrase in question.  (Northrop's Mem. of P. & A. in Opp'n to Factory Mutual's Mot. for Partial Summ. J. ("Northrop Opp'n") 5:13-
19  14 (emphasis in original).)
        The following cases reference the relevant language:  Lunday
20  v. Lititz Mut. Ins. Co., 276 So. 2d 696 (Miss. 1973); Grace v. Lititz Mut. Ins. Co., 257 So. 2d 217 (Miss. 1972); Lititz Mut. Ins.
21  Co. v. Buckley, 261 So. 2d 492 (Miss. 1972); Lititz Mut. Ins. Co. v. Boatner, 254 So. 2d 765 (Miss. 1971); Fireman's Ins. Co. of
22  Newark v. Schulte, 200 So. 2d 440 (Miss. 1967); West Beach Dev. Co. v. Royal Indem. Co., No. 99-0782-P-S, 2000 WL 1367994 (S.D. Ala.
23  Sept. 19, 2000); Mayton v. Auto-Owners Ins. Co., No. 3:-5CV667, 2006 WL 1214831 (E.D. Va. May 2, 2006); Opar v. Allstate Ins. Co.,
24  751 So. 2d 758 (Fl. Ct. App. 2000); Hardware Dealers Mut. Ins. Co. v. Berglund, 393 S.W.2d 309 (Tex. 1965); Transcon. Ins. Co. v.
25  RBMW, Inc., 551 S.E.2d 313 (Va. 2001); Tuepker v. State Farm Fire & Cas. Co., No. 1:05CV559, 2006 WL 1442489 (S.D. Miss. May 24, 2006);
26  Leonard v. Nationwide Mut. Ins. Co., 438 F. Supp. 2d 684 (S.D. Miss. 2006); Greer v. Owners Ins. Co., 434 F. Supp. 2d 1267 (N.D.
27  Fla. 2006); Paulson v. Fire Ins. Exchange, 393 S.W.2d 316 (Tex. 1965); Transcon. Ins. Co. v. RBMW, Inc., 262 Va. 502, 551 S.E.2d
28  313 (2001).

are not explicitly excluded in the Excess Policy, the Excess Policy's flood exclusion cannot be said to "clearly" exclude hurricane storm surge damage.[13]

Factory Mutual attempts to account for this discrepancy by noting that the Primary Policy and the Excess Policy were written on two different policy forms. The Primary Policy is an AON/Factory Mutual "hybrid" form drafted by AON, and the Excess Policy is a separate Factory Mutual "Advantage" form drafted by Factory Mutual. Thus, Factory Mutual contends that the additional words may add emphasis, but their absence does not negate the plain meaning of the words used in the Flood exclusion.

Nevertheless, although Factory Mutual may have intended for the flood definition in the AON/Factory Mutual hybrid form to convey the same intent as Factory Mutual's Flood definition, the language used did not clearly and explicitly accomplish that objective. Moreover, as a matter of California law, the words "whether driven by wind or not" in the Primary Policy are not surplusage, and their absence from the Excess Policy cannot be

---

[13] Factory Mutual argues that the Named Windstorm reference in the Primary Policy does not affect the exclusions in the Excess Policy because Named Windstorm appears only in the "Deductible" section of the Primary Policy. However, Named Windstorm, Flood and Wind are defined as general terms in the "definitional" section of the Primary Policy. (Volume of Exhibits in Support of Northrop Grumman Corporation's Mot. for Partial Summ. J. Ex. F Primary Policy UB270 60.L.) Because neither Wind nor Named Windstorm are redefined in the Excess Policy, it would have been reasonable for Northrop to presume that those definitions in the Primary Policy would be extended and applied to the Excess Policy. Moreover, because neither is listed as a specific exclusion, it would have been reasonable for Northrop to presume that the perils of Wind and Named Windstorm were covered by the Excess Policy. Conversely, where a term is given a new definition in the Excess Policy, without specifying whether it replaces or expands upon the previous definition given in the Primary Policy - i.e., Flood - the inconsistent definitions create ambiguity.

1  deemed meaningless.  See Maxconn, 74 Cal. App 4th 1267, 1279

2  (1999); Mirpad, 132 Cal. App. 4th 1058, 1072-73 (applying

3  "fundamental principle that policy language be so construed as to

4  give effect to every term" to avoid rendering words in policy

5  "superfluous and meaningless").  The absence of the terms "whether

6  driven by wind or not" convey meaning, or at least create

7  ambiguity, just as the inclusion of those words in the Primary

8  Policy cannot be rendered surplusage and must convey meaning.  See

9  Maxconn, 74 Cal. App. 4th 1267, 1279 (1999).

10     It is conceivable that, if the Court were to construe the

11 provisions of the Excess Policy in the absence of the Primary

12 Policy, it might reach the same conclusion as Factory Mutual - that

13 the policy clearly and explicitly encompasses a storm surge

14 exclusion.  However, the ambiguity present in the Flood exclusion

15 is exacerbated by the inconsistent definitions of flood in the two

16 policies.  Specifically, it is not the mere omission of the phrase

17 from the Excess Policy that creates ambiguity.  Rather, it is the

18 deviation from the initial definition used in the Primary Policy

19 which creates uncertainty about whether "Flood" had different

20 meanings in the Primary and Excess Policies.

21     The Court is bound by California law and common standards of

22 contract interpretation to construe the language of the Excess

23 Policy in the context of the document as a whole.  MacKinnon, 31

24 Cal. 4th at 648 (stating that "language in a contract must be

25 interpreted as a whole, and in the circumstances of the case").  In

26 giving effect to every term in the two definitions of Flood, it is

27 clear that the incongruent definitions create an ambiguity as to

28 whether storm surge flooding is excluded in the Excess Policy.

1    Thus, although Factory Mutual argues that the Court should

2    interpret the terms of the Excess Policy without regard to the

3    Primary Policy, this approach seems illogical.  The Excess Policy

4    is clearly "excess" of something.  It does not exist in a vacuum.

5    Further, Factory Mutual was aware[14] of the definitions of Flood,

6    Wind, and Named Windstorm in the Primary Policy.  By using a

7    definition of "Flood" in the Excess Policy that differed from the

8    definition of "Flood" in the Primary Policy, Factory Mutual created

9    an ambiguity that may have led Northrop to believe that Factory

10   Mutual drafted an exclusion for flood" that did not clearly

11   encompass storm surge damage.  Accordingly, on its face, the Excess

12   Policy fails to clearly exclude loss caused by "storm surge" or

13   "wind-driven water."

14

15   **V.    OVERALL CONTEXT OF THE EXCESS POLICY**

16       Because the Court finds that the plain language of the Flood

17   Exclusion does not clearly encompass "storm surge," it must now

18   examine the overall context of the Excess Policy to determine

19   _____

20       [14]  The Primary Policy was structured in a shared/layered
     arrangement with approximately 30 participating insurers <u>including</u>

21   Factory Mutual.  (FM Mot. 4:7-9.)  The second layer, above $500
     million, was an excess layer with Factory Mutual as the only

22   insurer.  (FM Mot. 4:9-10.)  To obtain property insurance for
     Northrop for the 2005-2006 policy year, AON submitted a proposal to

23   the insurance market that requested a primary policy described as
     "All Risk including Earthquake, Flood, Boiler & Machinery" and

24   suggested an excess layer described as "All Risk including Boiler &
     Machinery (<u>Excluding Earthquake and Flood</u>)."  (FM Mot. 4:12-5:6;

25   Ex. 24 398, emphasis in original.)  In response, Factory Mutual
     provided a quote for the 2005-2006 property renewal insurance

26   coverage.  (FM Mot. 5:7-10.)  Northrop, through AON, accepted
     Factory Mutual's quote and on March 31, 2005, Factory Mutual

27   transmitted its primary and excess policies to AON.  (FM Mot. 5:12-
     13; Ex. 3 March 31, 2005 E-Mail String p. 108.)  Thus, Factory

28   Mutual was clearly aware of the flood definition in the Primary
     Policy when it was issuing the Excess Policy.

                                    20

1  whether Northrop's objectively reasonable expectations as

2  understood by Factory Mutual at the time of contracting were that

3  hurricane storm surge damage is Flood.  Cal Civ. Code § 1649; see

4  also Bank of the West, 2 Cal. 4th at 1264-65.  Examples of what the

5  Court may consider include: (1) negotiations or discussions about

6  the scope of coverage; (2) any special meaning given to particular

7  phrases by usage; or (3) other matters that might reflect the

8  mutual understanding of the parties concerning the scope of

9  coverage.  Fireman's Fund Ins. Companies v. Atlantic Richfield Co.,

10 94 Cal. App. 4th 842, 852 (2001).

11      First, Factory Mutual argues that Northrop had identified

12 similar storm surge as Flood damage after Hurricane Isabel, which

13 occurred in September 2003.[15]  However, in response to Factory

14

15      [15]  At the time of Hurricane Isabel, Northrop and its
16 subsidiary, Newport News Shipbuilding, were insured under Factory
   Mutual Insurance Company Policy No. UB060, which contained Factory
17 Mutual's Flood definition, identical to the Flood definition in the
   Excess Policy at issue.  (FM Opp'n 14:3-7; Ex. 50 Policy No.
18 UB060.)  After Hurricane Isabel, Northrop segregated the damage
   between wind damage and flood damage.  (FM Opp'n 14:8-9; Ex. 32
19 Eley Depo. 72:1-19, 78:12-79:4; Ex. 45 September 17, 2003 E-Mail
   String.)  Northrop used its own internal guidelines for its
20 accounting system to set up and track work orders and costs wherein
   flood related damage was defined as damage caused by "rising or
21 surge flood water."  (FM Opp'n 14:9-10; Ex. 43 Hurricane Isabel
   Project Plans & Cash Flow Data; Ex. 32 Eley Depo. 55:1-10 (emphasis
22 omitted).)  Thus, Factory Mutual argues, Northrop's internal
   guidelines demonstrate that Northrop believed "storm surge" was
23 Flood under the same definition used in the Excess Policy, which
   does not contain the phrase "whether driven by wind or not."  That
24 coverage claim, however, evolved at a different site, involved
   different personnel from those involved in procuring the Excess
25 Policy, and constituted a loss that was well within the sub-limit
   for Flood coverage and therefore did not raise any of the issues
26 being disputed here.  Thus, the events that occurred in connection
   with Hurricane Isabel are too remote to singlehandedly prove either
27 party's point.
        However, the Court does note that the parties' previous
28 dealings are relevant in determining whether Northrop's expectation
   of coverage was objectively reasonable.

1    Mutual's arguments, Northrop emphasizes that the Northrop corporate

2    risk management personnel responsible for the purchase of the

3    Excess Policy were not involved in the Hurricane Isabel claim.

4    Thus, Northrop concludes, the assessments procured in the other

5    claim are irrelevant.   Moreover, when Factory Mutual adjusted storm

6    surge damage claims from the Pascagoula facility arising out of

7    Hurricane Georges, which occurred in September 1998, Factory Mutual

8    classified the "storm surge" damage under the "wind" peril, not the

9    "flood" peril.[16]   (Northrop Reply 18:15-17; RSOF-III ¶ 5.)

10

11       [16]   When Hurricane Georges hit the Pascagoula facility at
     issue here, then owned by Northrop's predecessor Litton, the
12   property was covered under a policy sold by a Factory Mutual
     company.   (Northrop Grumman's Reply Mem. of P. & A. in Further
13   Supp. of its Mot. for Partial Summ. J. "Northrop Reply" 18:18-19:3;
     RSOF-III ¶¶ 4, 6-7.)   The same adjustor Factory Mutual assigned to
14   Northrop's Katrina claim, Chris Roza, was responsible for adjusting
     Litton's Hurricane Georges claim for Factory Mutual.   (Northrop
15   Reply 19:3-5; RSOF-III ¶¶ 8-9.)   After Mr. Roza visited the
     Pascagoula shipyard, he sent a letter to then Litton employee, and
16   subsequent Factory Mutual underwriter Jeff Green, confirming
     notification of the loss.   (Northrop Reply 19:5-7; RSOF-III ¶¶ 10,
17   14.)   In that letter, Mr. Roza stated that "as a result of
     Hurricane Georges, there was extensive wind and water damage at the
18   facility."   (Northrop Reply 19:7-9; RSOF-III ¶¶ 11.)   In the
     document's heading, however, Mr. Roza clearly branded: "LOSS
19   DESCRIPTION:   Wind."   (Northrop Reply 19:9-10; RSOF-III ¶¶ 12.)
     Mr. Roza testified that the reference in that letter to "Loss
20   Description" was intended to reference the peril under which
     Factory Mutual was adjusting the claim, and that although Factory
21   Mutual's practice was to open multiple perils for a given loss, in
     that instance Factory Mutual decided to adjust the entire claim
22   under the "wind" peril.   (Northrop Reply 19:11-14; RSOF-III ¶¶ 30.)

23       Numerous other documents pertaining to Litton's Hurricane
     Georges loss state that all such loss, including the "storm surge"
24   loss, were caused by the single peril of "wind."   (Northrop Reply
     19:14-16; RSOF-III ¶¶ 12, 25.)   For example, Mr. Roza's September
25   28, 1998 and November 19, 1998 internal Factory Mutual claim
     adjustment memoranda reporting on Northrop's Hurricane Georges
26   claim make clear that despite characterizing the loss as "extensive
     wind and storm surge damage," Factory Mutual adjusted the claim
27   under the "wind" peril and applied the "Named Storm" deductible.
     (Northrop Reply 19:17-21; RSOF-III ¶ 25.)   Likewise, Mr. Roza sent
28   another letter to Mr. Green dated November 23, 1998 in response to
                                                        (continued...)

1      Additionally, Factory Mutual fails to mention that in February

2  2001, after Hurricane Georges, its loss control engineers conducted

3  an Engineering Risk Assessment of Northrop's properties shortly

4  before Northrop finalized its acquisition of Litton, in order to

5  characterize the types of perils Northrop's facilities reasonably

6  could face.   (Northrop Reply 20:3-6; RSOF-III ¶¶ 18-22.)   That

7  report included a glossary of terms defined and explained by

8  Factory Mutual.   (Northrop Reply 20:6-7; RSOF-III ¶ 18.)   Two of

9  the terms were "Flood" and "Wind."   (Northrop Reply 20:8; RSOF-III

10 ¶ 19.)   Consistent with its description of the Hurricane Georges

11 claim, "storm surge" damage is referenced in the "wind"

12 description.   (Northrop Reply 20:8-10; RSOF-III ¶ 20.)

13 Specifically, Factory Mutual notes that wind peril "[s]everity is

14 based on the surrounding topography, exposure to storm surge, and

15 other factors."   (Northrop Reply 20:10-12; RSOF-III ¶ 22.)   In

16 contrast, Factory Mutual does not reference storm surge when

17 discussing flood.   (Northrop Reply 20:12-13; RSOF-III ¶ 21.)

18     Given the foregoing, it appears that the parties' actions in

19 connection with hurricanes which previously affected the Pascagoula

20 shipyards suggest that the parties have not had a consistent view

21 of whether storm surge is a "wind" or a "flood" event.   This

22 inconsistency is further established by policies Factory Mutual

23 previously sold to Northrop and to its predecessor, Litton, that

24

25     [16]   (...continued)
   Mr. Green's request for an advance payment, in which Mr. Roza again
   described the loss to its insured as "Wind."   (Northrop Reply
26 19:21-20:2; RSOF-III ¶ 12.)   Though these instances did not occur
   in connection with the 2004-2005 Policy or Hurricane Katrina,
27 Factory Mutual's response after Hurricane Georges may have created
   an expectation that storm surge was characterized as a "wind," not
28 "flood," event.

1    expressly excluded coverage for loss caused by storm surge.  For

2    example, Factory Mutual Policy No. UA848, which provided all risk

3    property coverage to Litton for the policy period August 1, 2000 to

4    August 1, 2001, specifically excluded "wind driven storm surge" as

5    part of the exclusion for "Sturmflut" applicable to certain

6    European locations.[17]  (Northrop Mot. 18:19-22; SOF ¶¶ 51, 53.)

7    This policy also included a separate definition for the peril of

8    "flood," further supporting Northrop's argument that it reasonably

9    believed Factory Mutual considered Flood and "storm surge" (or

10   "Sturmflut") as separate and distinct perils.  (Northrop Mot.

11   18:25-19:1; SOF ¶ 54.)  Factory Mutual included a similar Sturmflut

12   Exclusion in Policy No. UA726, which covered Northrop from April 1,

13   1999 to April 1, 2002, and likewise included a separate definition

14   for the peril of "flood."  (Northrop Mot. 19 n.5; SOF ¶¶ 55-57.)

15   Thus, Factory Mutual's failure to include this or comparable

16   clarifying language in the Excess Policy, when contrasted with the

17   definite terms used in previous policies, could have created

18   reasonable confusion as to whether the Excess Policy excludes storm

19   surge flooding.

20        Because the parties' history of dealing does not resolve the

21   ambiguity, the Court turns to the evidence submitted regarding the

22   _____

23        [17]  Policy No. UA848 includes a "Sturmflut Exclusion," and
     defines "Sturmflut" as:

24        general and temporary condition of partial or complete
          inundation of dry land areas caused by or resulting from

25        the overflow of river, lake, bay, estuary or tidal waters
          because of the rapid accumulation of runoff of surface

26        waters from any source or from wind driven storm surge,
          tidal wave, high tide, flood tide, wave wash, or tsunami."

27   (Northrop's Reply Statement of Genuine Issues and Additional Facts
     in Supp. of Northrop's Mot. for Partial Summ. J. "Northrop SOF" ¶¶

28   51, 53.)

                                    24

1   process of procuring the insurance policies at issue.  A detailed

2   review reveals that neither party was clear about the breadth of

3   the Flood exclusion.  Both parties rely on the 2005 Underwriting

4   Detail, a document that AON, Northrop's broker, prepared and

5   submitted to the insurance market in approximately February 2005 in

6   connection with the renewal of Northrop's property insurance.

7   Northrop emphasizes the definition of storm surge included in its

8   Natural Hazard Loss Analysis section:

9          Storm Surge - Quickly rising ocean water levels associated

10         with windstorms that can cause widespread flooding at or

11         near coastal areas.  Considerable storm surge damage is

12         possible far inland.  Storm surge loss estimates are

13         included in our windstorm analyses unless mentioned

14         otherwise.

15  (Northrop Opp'n 17:27-18:6; CSOF ¶ 56.)  Northrop claims this

16  statement memorializes its understanding that storm surge is

17  associated with a wind or windstorm event, rather than a flood

18  event.  (Northrop Opp'n 17:23-26.)  Factory Mutual, however,

19  emphasizes that the submission specifically requested a sub-limit

20  of "$400 million per occurrence and in the Annual Aggregate as

21  respects Flood."  (Factory Mutual Ins. Co.'s Mem. of P. & A. in

22  Supp. of its Mot. for Partial Summ. J. "Factory Mutual Mot." 4:16-

23  17; Ex. 24 2005 Submission.)  According to Factory Mutual, this

24  proves Northrop expected the Flood exclusion to encompass all types

25  of flooding - including storm surge damage.

26         However, while these statements shed light on Northrop's storm

27  surge interpretation and flood sub-limit expectations prior to

28  securing the Primary and Excess Policies, neither confirms that the

25

1  Flood definition in the Excess Policy specifically includes, or

2  excludes, storm surge damage.  Moreover, there are other terms

3  defined in the Primary Policy that are essential to coverage

4  determinations under the Excess Policy.  For example, the term

5  "occurrence" is not defined in the Excess Policy, yet Factory

6  Mutual cannot reasonably deny that the term "occurrence" is

7  necessary to determining coverage under the Excess Policy or that

8  the Primary Policy's definition of that term applies to the Excess

9  Policy.  Similarly, Factory Mutual admits that losses caused by the

10 peril of Wind are covered without sub-limit by the Excess Policy,

11 (RSOF-I/UF ¶¶ 44-45), yet Factory Mutual defined that term only in

12 the Primary Policy and did not repeat that definition in the Excess

13 Policy.  (Northrop Reply 6:10-13; RSOF-I/UF ¶¶ 24, 36.)  Notably,

14 one of Factory Mutual's experts on underwriting issues stated that,

15 at least for certain purposes, adjusting a claim under the Excess

16 Policy would require consideration of the Primary Policy's Named

17 Windstorm definition.  (Northrop Reply 6:1-4; RSOF-III ¶ 31.)

18 Given the overlap between the terms used in each policy, it would

19 be inconsistent for the Court to determine that some defined terms

20 in the Primary Policy carry over to the Excess Policy while others

21 do not.

22     Additionally, Factory Mutual's failure to use available

23 alternative language supports the reasonableness of Northrop's

24 expectation.  The Excess Policy's intent to cover loss caused by

25 storm surge is underscored by contrasting the Excess Policy with

26 other insurance policies that Factory Mutual has written that (1)

27 clearly and specifically exclude coverage for loss caused by storm

28 surge; and/or (2) define "flood" to include water events that are

26

1  "driven by wind."   Factory Mutual's "failure to use available

2  language to exclude certain types of liability gives rise to the

3  inference that the parties intended not to so limit coverage."

4  Fireman's Fund Ins. Companies v. Atlantic Richfield Co., 94 Cal.

5  App. 4th 842, 852 (2001).   As the Ninth Circuit has explained:

6           The language of the insurance policy is broad, and the onus

7           was on the drafter of the policy to convey any limitations.

8           If [the insurer] desired to limit coverage . . . , it could

9           have expressly done so.   Instead, it used broader language

10           . . . . Once again, [the insurer] failed to communicate an

11           asserted limitation conspicuously, plainly and clearly.

12  Pension Trust Fund for Operating Engineers v. Fed. Ins. Co., 307

13  F.3d 944, 953 (9th Cir. 2002).   Thus, Factory Mutual's use of broad

14  language where more specific terms were available may have given

15  rise to the reasonable inference that Factory Mutual did not intend

16  to exclude wind-driven flood.

17       Additionally, Factory Mutual's omission of the words "whether

18  driven by wind" in the Excess Policy's Flood Exclusion is

19  significant when compared with its inclusion of those very words in

20  the Primary Policy and in another exclusion in its Excess Policy.[18]

21  Arguably, the terms are used in an exclusion pertaining to "rain,

22

23 ───────────────────────

        [18]   Factory Mutual used the words "whether or not driven by
24  wind" in a different exclusion in the Excess Policy, which applies
    to buildings under construction:
25           C.   This Policy excludes . . . :
             . . . .
26           7) loss or damage to the interior portion of buildings
             under construction from rain, sleet or snow, whether or
27           not driven by wind, when the installation of the roof,
             walls and windows of such buildings has not been
28           completed.
    (Northrop Mot. 16:1-7; SOF ¶ 48.)

1   sleet and snow," in the completely different context of buildings

2   under construction.  However, it is notable that Factory Mutual

3   used the terms in one section of the Excess Policy and omitted them

4   in another.

5        Finally, Factory Mutual argues that Northrop's conduct

6   immediately after Hurricane Katrina proves that Northrop considers

7   storm surge damage as Flood.  Factory Mutual cites the reactions of

8   AON and Northrop executives in the direct aftermath of Hurricane

9   Katrina to demonstrate that they in fact interpreted the terms of

10   the policies to exclude storm surge coverage.[19]  However, these

11

12       [19]  Immediately after Hurricane Katrina, AON representatives
Brad Skinner and Robert Hayes reminded Northrop that its insurance
13   program had a $400 million Flood sub-limit.  (Factory Mutual Ins.
Co.'s App. of Ex. ("FM App.") Ex. 8 Bradley Skinner Dep. 71:9-14;
14   Ex. 9 Hayes Dep. 198:12-16, 199:1-9; Ex. 21 August 30, 2005 E-Mail
String; Ex. 26 September 1, 2005 E-Mail String.)  Mr. Hayes also
15   sent Northrop senior executive David Strode a copy of a policy
declarations page with the notation "Dave:  here is the page that
16   limits the flood to $400 million."  (FM App. Ex. 9 Hayes Dep.
199:4-9; Ex. 26 September 1, 2-5 E-Mail String.)
17       On August 31, 2005, Northrop's Director of Risk Management,
Dean Reynolds, sent an email to Mr. Strode [Northrop senior
18   executive] stating, in part:
      The size of the loss is unknown but Brad [Skinner of AON]
19       reminded us this afternoon that we have a 400 M sublimit
      for FLOOD claims and that first report of Katrina's damage
20       indicated significant flood damage from the storm surge at
      Pascagoula.  If this is confirmed, then we must carefully
21       watch the damage allocation between NAMED WINDSTORM and
      FLOOD.
22   (FM App. Ex. 16 Reynolds Dep. 174:2-25; Ex. 21 August 30, 2005
E-Mail String.)  Northrop's David Strode replied, "[g]iven our
23   exposure to hurrican [sic], I assume the 400M was the max we
could buy at a reasonable price or the max period?"  (FM App.
24   Ex. 21 August 30, 2005 E-Mail String.)
      Factory Mutual insists that these initial reactions are
25   crucial for identifying Northrop's expectations of coverage.  (FM
App. Ex. 8 Bradley Skinner Dep. 72:9-16; Ex. 25 August 31, 2005 E-
26   Mail String.)  However, most of the post-loss statements were made
by individuals who were uninvolved with procuring the Excess
27   Policy.  (Northrop Opp'n 17:3-5; CSOF ¶¶ 52-54.)  Moreover, post-
loss admissions are irrelevant because they do not demonstrate the
28   intent of the parties at the time of contracting.  <u>National Union</u>,
                                             (continued...)

1  post-loss admissions do not confirm the parties beliefs at the time

2  of contracting.  More importantly, while these post-loss admissions

3  demonstrate that Factory Mutual's understanding is at least

4  reasonable, they do not demonstrate that Northrop's understanding

5  is <u>unreasonable</u>.  Where a policy exclusion is ambiguous, and the

6  insured's interpretation is at least objectively reasonable, that

7  ambiguity is strictly construed against the insurer and in favor of

8  coverage.

9       "[W]e are not required, in deciding the case at bar, to

10      select one 'correct' interpretation from the variety of

11      suggested readings.  To affirm the trial courts' decision

12      in favor of claimants, we need not determine that the two

13      interpretations proposed by the insurer are not possible,

14      or even reasonable, interpretations of the clause in

15      question . . . . Instead, even assuming that the insurer's

16      suggestions are reasonable interpretations which would bar

17      recovery by the claimants, we must nonetheless affirm the

18      trial courts' finding of coverage so long as there is <u>any</u>

19      <u>other reasonable interpretation under which recovery would</u>

20      <u>be permitted in the instant cases</u>."

21  <u>Mackinnon</u>, 31 Cal. 4th at 655 (quoting <u>State Farm Mut. Auto Ins.</u>

22  <u>Co. v. Jacober</u>, 10 Cal. 3d at 202-203).  The Court recognizes the

23

24      [19]  (...continued)

25  885 F. Supp. at 207 (sustaining an evidentiary objection where "the
    documents themselves do not deal with evidence concerning the

26  parties intention in formation of the policy, but rather post-
    formation dealings between the insured and the carriers," and thus

27  have "dubious relevance").  Therefore, although the statements
    support Factory Mutual's stance that its interpretation of the

28  Flood exclusion is <u>reasonable</u>, they do not prove that Northrop's
    expectations are <u>unreasonable</u>.

1  reasonableness of Factory Mutual's interpretation.  However,
2  Factory Mutual cannot prove that its interpretation is the only
3  reasonable interpretation.  In order to prevail on a policy
4  exclusion defense, the insurer must prove that "its interpretation
5  is the only reasonable one."  MacKinnon, 31 Cal. 4th at 655.
6  Factory Mutual has shown only that there are at least two
7  reasonable interpretations of the Excess Policy - not that
8  Northrop's interpretation is unreasonable.
9      In sum, after reviewing the evidence - the parties' conduct in
10 connection with Hurricanes Isabel and Georges, the terms of
11 previous policies, the Underwriting Detail for the 2004-2005
12 Policy, the interdependency of the Primary and Excess Policy
13 definitions, alternative available language, and the post-loss
14 admissions - the Court finds that Northrop's expectation of
15 coverage was reasonable.  It appears that both parties had
16 inconsistent understandings of the term "storm surge" and whether
17 it would be characterized as "wind," "flood," or "Named windstorm."
18 There are several ways that Factory Mutual could have unambiguously
19 excluded storm surge damage:  it could have drafted a Named
20 Windstorm exclusion; it could have drafted a "storm surge"
21 exclusion similar to the ones it included in other policies it
22 previously sold to Northrop and Litton; it could have defined
23 "Flood" to include "water resulting from a Named Windstorm"; or it
24 could have used the wording of the Primary Policy's Flood
25 definition.  Additionally, there is no evidence indicating whether
26 "storm surge" damage was explicitly discussed with regard to the
27 Excess policy or whether the premiums that Northrop paid reflected
28 the insurance market's calculation of the risk of "storm surge"

1 | damage payment.  In short, the parties' past dealings do not
2 | illuminate or resolve any ambiguity that exists with respect to
3 | coverage for storm surge under the Excess Policy.  Therefore, in
4 | light of the omission of "whether driven by wind or not" in the
5 | Excess policy, the inclusion of "Flood" in the definition of "Named
6 | Windstorm" under the Primary Policy, and the inconsistent treatment
7 | of "storm surge" damage in the parties' prior dealings, the Court
8 | holds that Northrop's expectation of coverage was reasonable.

9 |     Given Northrop's reasonable expectation of coverage, the Court
10 | must construe the ambiguity against the party who caused the
11 | uncertainty to exist.  As noted earlier, in the insurance context,
12 | this party is typically the insurer.  Although both parties in this
13 | case are sophisticated, and it does not appear that Northrop
14 | suffered from a lack of bargaining power, the burden was still on
15 | Factory Mutual, as the drafter of the Excess Policy and a provider
16 | under the Primary Policy, to state the Flood exclusion
17 | unambiguously.  The Court finds that it failed to do so, and that,
18 | pursuant to the California rules of contract interpretation,
19 | judgment must therefore be entered in Northrop's favor.

20 |

21 | **VII. CONCLUSION**

22 |     For the foregoing reasons, the Court grants Northrop's motion
23 | and denies Factory Mutual's motion.

24 |

25 | IT IS SO ORDERED.

26 |

27 | Dated: 8-16-07

28 |

DEAN D. PREGERSON
United States District Judge

31