O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| NORTHROP GRUMMAN CORPORATION, | ) ) ) | Case No. CV 05-08444 DDP (PLAx) |
| Plaintiff, | ) ) | **ORDER GRANTING IN PART AND DENYING IN PART NORTHROP'S MOTION** |
| v. | ) ) ) | **FOR SUMMARY JUDGMENT AND GRANTING FACTORY MUTUAL'S MOTION FOR DECLARATION** |
| FACTORY MUTUAL INSURANCE COMPANY, | ) ) ) | [Dkt. Nos. 429 & 439] |
| Defendant. | ) ) ) ) | |
| _____ | ) | |

Presently before the court are Plaintiff Northrop Grumman's Motion for Partial Summary Judgment and Defendant Factory Mutual Insurance Company's Phase II Motion for Summary Judgment. Having considered the parties' submissions and heard oral argument, the court adopts the following order.

**I. BACKGROUND**

Northrop Grumman Corporation ("Northrop") is a global defense contractor. Northrop operates shipyards and facilities throughout the Gulf Coast. Its Mississippi subsidiary, Northrop Grumman Ship Systems, is headquartered in Pascagoula, Mississippi. Northrop's shipbuilding business consists of two primary shipyards in

Pascagoula and New Orleans, Louisiana ("Avondale").  In or about 1999, Northrop acquired a company which had acquired Avondale.  As part of the acquisition, Northrop acquired contracts with the Navy and Coast Guard for the construction of ships including LHD-8, LPDs, DDGs, and NSCs.  The Avondale yard was also finalizing delivery of a commercial ship program called Polar.

For the April 1, 2005, to April 1, 2006, policy year, Northrop purchased approximately $20 billion in all risk property insurance. Northrop's 2005-2006 property insurance program consists of two layers.  The first layer consists of a $500 million layer of primary coverage (the "Primary Layer").  The Primary Layer is comprised of approximately 30 policies.  Factory Mutual Insurance Company ("Factory Mutual") issued one of the Primary Layer's policies (the "Factory Mutual Primary Policy" or "Primary Policy").

The Factory Mutual Primary Policy is an "all risk" policy. The Primary Policy defines certain perils including "Flood."  The second layer is the excess layer (the "Excess Policy").  The Excess Policy is a single all risk policy sold to Northrop by Factory Mutual.  The Excess Policy provides approximately $20 billion worth of coverage for losses in excess of $500 million.  The Excess Policy contains an exclusion for flood.  The Limits of Liability provision in the Primary Layer states that the Excess Policy's $500 million attachment point is subject to the Excess of Loss provisions.  The Excess of Loss provisions state that when a loss was caused by both covered and excluded losses, the Primary Policies are deemed to apply first to the excluded losses.

The Primary Policy provides a number of time element coverages to indemnify Northrop for financial and economic losses that result

1   from property damage.  The Excess Policy also provides coverage for

2   property damage and Time Element coverage.  With regard to Time

3   Element coverage, the Excess Policy states as follows:

4        A.   This Policy insures TIME ELEMENT loss, as
             provided in the TIME ELEMENT COVERAGES,
5            directly resulting from physical loss or damage
             of the type insured by this Policy:
6            1)   to property described elsewhere in
                  this Policy and not otherwise exclude
7                 by this Policy or otherwise limited
                  in the TIME ELEMENT COVERAGES below;
8            2)   used by the Insured, or for which the
                  Insured has contracted use;
9            3)   located at an Insured Location; or
             4)   while in transit as provided by this
10                Policy, and
             5)   during the Periods of Liability
11                described in this section.

12  (Chris B. Roza Decl. Exh. 1-A.)

13       The Time Element Coverages in the Excess Policy are defined

14  and include the loss of gross earnings as follows:

15       1)   Measurement of Loss:
             a)   The recoverable GROSS EARNINGS loss is the
16                Actual Loss Sustained by the Insured of
                  the following during the PERIOD OF
17                LIABILITY:
                  (i)  Gross Earnings;
18                (ii) less all charges and expenses
                       that do not necessarily continue
19                     during the interruption of
                       production or suspension of
20                     business operations or services;
                  (iii)plus all other earnings derived from the
21                     operation of the business.

22  (Id.)  Gross Earnings for manufacturing operations are defined as

23  "the net sales value of production less the cost of all raw stock,

24  materials and supplies used in such production."  (Id.)

25       In August 2005, Hurricane Katrina struck the Gulf Coast region

26  and caused significant damage.  Northrop's Pascagoula shipyard was

27  in the process of building ships LHD-8, LPD 17 and 19, DDG 100,

28  103, 105, 107, and 110, and NSC 1 and 2.  (Hendry Report, §§ 2, 3;

1   LeeVan Report at pp. 7, 10; Yount Depo at 40:1-11. )   The Avondale

2   shipyard was finalizing Polar E and building LPD 18, 20, and 21.

3   (Id.)   Although each of the ships had a primary building location,

4   portions of some of the ships were assigned to other Gulf Coast

5   shipyards as well.   (Hendry Report, §§ 2, 3; 2013 Lee Van Depo at

6   35:17-37:5; Yount Depo at 87:8-14.)

7        It is undisputed that, at the time of Hurricane Katrina, the

8   contract in place for LPDs 18-20 was a cost plus award fee

9   contract, and the contract for LPD 21 was a cost plus incentive fee

10  contract, and that under these types of contracts, Northrop was

11  entitled to reimbursement from the Navy for allowable costs

12  incurred to build the ship, including overhead costs.   When

13  Hurricane Katrina struck, Northrop was not entitled to any

14  incentive fees on the LPDs 18-20.

15       It is also undisputed that between 2005 and 2009, Northrop

16  received federal income tax relief pursuant to the Katrina

17  Emergency Tax Relief Act of 2005 and the Gulf Opportunity Zone Act

18  of 2005.   Factory Mutual's sixteenth affirmative defense asserts an

19  offset to Northrop's insurance claim of approximately $9.4 million

20  based on the federal income tax credit.

21       Northrop moves for summary judgment on Factory Mutual's

22  sixteenth Affirmative Defense, arguing that there should be no

23  offset of the Tax Credit or of certain payments from the Navy.

24       Factory Mutual moves for summary judgment on Northrop's Time

25  Element claim, (1) arguing that it is entitled to summary judgment

26  because Northrop has failed to tie its Time Element claim to

27  property damage or loss or seeking, in the alternative, a

28  declaration that all Time Element loss must result from property

4

1  damage or loss and that it is Northrop's burden to demonstrate as

2  much, and (2) arguing that it is entitled to summary judgment on

3  Northrop's Time Element claims for ships LPD 18-21 because Northrop

4  was fully compensated for those ships by the Navy.

5  **II. LEGAL STANDARD**

6       Summary judgment is appropriate where the pleadings,

7  depositions, answers to interrogatories, and admissions on file,

8  together with the affidavits, if any, show "that there is no

9  genuine dispute as to any material fact and the movant is entitled

10  to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party

11  seeking summary judgment bears the initial burden of informing the

12  court of the basis for its motion and of identifying those portions

13  of the pleadings and discovery responses that demonstrate the

14  absence of a genuine dispute of material fact.  Celotex Corp. v.

15  Catrett, 477 U.S. 317, 323 (1986).  All reasonable inferences from

16  the evidence must be drawn in favor of the nonmoving party.  See

17  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

18  If the moving party does not bear the burden of proof at trial, it

19  is entitled to summary judgment if it can demonstrate that "there

20  is an absence of evidence to support the nonmoving party's case."

21  Celotex, 477 U.S. at 325.

22       Once the moving party meets its burden, the burden shifts to

23  the nonmoving party opposing the motion, who must "set forth

24  specific facts showing that there is a genuine issue for trial."

25  Anderson, 477 U.S. at 256.  Summary judgment is warranted if a

26  party "fails to make a showing sufficient to establish the

27  existence of an element essential to that party's case, and on

28  which that party will bear the burden of proof at trial."  Celotex,

477 U.S. at 322.  A genuine issue exists if "the evidence is such
that a reasonable jury could return a verdict for the nonmoving
party," and material facts are those "that might affect the outcome
of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248.
There is no genuine issue of fact "[w]here the record taken as a
whole could not lead a rational trier of fact to find for the non-
moving party." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>,
475 U.S. 574, 587 (1986).

It is not the court's task "to scour the record in search of a
genuine issue of triable fact." <u>Keenan v. Allan</u>, 91 F.3d 1275,
1279 (9th Cir. 1996).  Counsel has an obligation to lay out their
support clearly.  <u>Carmen v. San Francisco Unified Sch. Dist.</u>, 237
F.3d 1026, 1031 (9th Cir. 2001).  The court "need not examine the
entire file for evidence establishing a genuine issue of fact,
where the evidence is not set forth in the opposing papers with
adequate references so that it could conveniently be found." <u>Id.</u>

**III. DISCUSSION OF NORTHROP'S MOTION**

Northrop argues that it is entitled to summary judgment on
Factory Mutual's sixteenth affirmative defense, according to which
Northrop's claim should be reduced by (1) approximately 9.4 million
of the federal income tax credits that Northrop received, and (2)
payments from the Navy.

**A.   Offset of Tax Credit**

The Factory Mutual Primary Policy includes "Business
Interruption - Gross Earnings" coverage.  The parties do not
dispute that as part of the adjustment of Northrop's loss, Factory
Mutual agreed to treat as covered under the Primary Layer the total
amount of retention pay that Northrop paid to its employees ($38

million) during the period Northrop's business was inoperable due to Hurricane Katrina.   The parties also do not dispute that Northrop received a tax credit totaling nearly $9.4 million (the "Tax Credit").   Northrop obtained the Tax Credit from Sections 201 and 202 of the Katrina Emergency Tax Relief Act of 2005 and the Gulf Opportunity Zone, which allowed eligible employers to receive a tax credit of 40% of the first $6,000 in wages paid to each eligible current employee (i.e. $2,400) immediately after the storm.   Pub. L. No. 109-73 § 202, 119 Stat. 2021, 2021-22 (2005), as amended by Pub L. No. 109-135, § 201, 119 Stat. 2596, 2602 (2005)(codified at 26 U.S.C. § 1400R(2006)).

Both the Primary Policy and the Excess Policy have provisions allowing offsets.   The Primary Policy contains the following "Salvage and Recoveries" provision:

> Except as described in Clause 27, after expenses incurred in salvage or recovery are deducted, any salvage or other recovery, except recovery through subrogation proceedings and/or from underlying and/or excess insurance as described herein, shall accrue entirely to the benefit of the Insurer until the sum paid by the Insurer has been recovered.

(Northrop Exh. B, pp.42-43, ¶ 28.)   The Excess Policy contains the following "Collection from Others" provision:

> The Company will not be liable for any loss to the extent that the Insured has collected for such loss from others.

(Northrop Exh. C, p. 105, § D, ¶ 6.)

Factory Mutual argues that the Tax Credit falls within both the "Salvages and Recoveries" provision and the "Collection from Others" provision.   According to Factory Mutual, the Tax Credit constitutes a recovery for the retention pay, and Factory Mutual is entitled to offset $9.4 million of the $38 million that Northrop

spent on retention pay.  Northrop contends that the Tax Credit does
not constitute a recovery and should not be offset from Factory
Mutual's retention pay payment.

Factory Mutual points to a case from the Virginia Supreme
Court where the court found that an insurance company could offset
federal funds because those funds constituted a recovery.  PMA
Capital Insurance Company v. US Airways, Inc., 271 Va. 352, 360-61
(2006).  The case concerned funding provided under the Air
Transportation Safety and System Stabilization Act ("Stabilization
Act"), which was enacted after 9/11 to "compensate air carriers . .
. for both 'direct losses' as a result of 'any Federal ground stop
order' and 'incremental losses' as a 'direct result of' the
September 11, 2011, terrorist attacks."  Id. at 359 (quoting the
Stabilization Act).  The court found that those funds were a form
of "recoveries" under the policy because they met the definition of
"recovery" as "the regaining or restoration of something lost or
taken away."  Id. at 360 (citing Black's Law Dictionary 1302 (8th
ed. 2004)).

Factory Mutual argues that here, as in PMA, the $9.4 million
tax credit is a "recovery" by Northrop of a portion of the $38
million retention pay that Factory Mutual has treated as covered
under the primary layer.  The amount of the Tax Credit depended
directly on the amount Northrop spent in retention pay.  Emergency
Tax Relief Act of 2005, PL 109-73, §§ 201-202, September 23, 2005,
119 Stat 2016 (allowing eligible employers to receive a tax credit
of 40% of the first $6,000 in wages paid to each eligible current
employee).  The Tax Credit thus, according to Factory Mutual, is a
recovery of a portion of the amount it paid in retention pay.  If

1  Northrop were to retain the Tax Credit as well as the full $38
2  million in retention pay from Factory Mutual, Northrop would end up
3  with over $47 million recovery for retention, when it only paid out
4  $38 million, which Factory Mutual calls a windfall.

5      The court finds this situation to be factually distinguishable
6  from PMA.  Unlike the Stabilization Act in PMA, the Tax Credit here
7  was intended as an incentive for employers to retain employees, not
8  as a compensation for loss.  As one congressman put it, "[s]everal
9  of these provisions . . . help businesses, help employers; and, of
10 course, we are trying to encourage employers in these affected
11 areas to bring workers back and to create jobs so that people can
12 come back and have an income."  151 Cong. Rec. H8189-01 (2005)
13 (statement of Cong. McCrery)).  See also 151 Cong. Rec. S13702-01
14 (2005)(statement of Sen. Baucus)("We must encourage individuals to
15 return.  And this means that there must be jobs for them to return
16 to.  This legislation gives businesses help to create those
17 jobs."), and 151 Cong. Rec. H8014, H8018 (daily ed. Sept. 15,
18 2005)(statement of Cong. Jefferson)("[T]he Katrina Emergency Tax
19 Relief Act also provides targeted incentives for returning
20 businesses and new businesses to employ the thousands of
21 hardworking Americans who have been displaced or lost jobs to
22 Hurricane Katrina.").  The relevant section is entitled "Employee
23 Retention Credit for Employers Affected by Hurricane Katrina,"
24 which emphasizes a credit rather than compensation for a loss.  For
25 these reasons, the court finds that the Tax Credit is not a
26 "recovery" or a "collection from others" in the sense of the Policy
27 because it is not a compensation for a loss but instead an
28 incentive to encourage employee retention.

1    This holding is consistent with the FEMA cases discussed by

2  both parties, Hawaii v. FEMA, 294 F.3d 1152 (9th Cir. 2002), and

3  Kiln Underwriting Ltd. v. Jesuit High School of New Orleans, No.

4  06-4350, 2008 WL 4724390 (E.D. La. Oct. 24, 2008).   The FEMA cases

5  concern the government's power to obtain reimbursement when FEMA

6  funds recipients later receive compensation from private insurance

7  policies.   The cases emphasize Congress's intent in the FEMA

8  statute to create incentives for companies to obtain private

9  insurance instead of depending on federal FEMA funds in the case of

10 disaster.   See, e.g. Hawaii v. FEMA, 294 F.3d at 1163 ("Congress'

11 concern, then, was that when there was the safety net of federal

12 disaster relief, covered parties and insurers were not seeking or

13 providing insurance coverage as they otherwise would.").   In the

14 FEMA statute, Congress explicitly required FEMA funds to be

15 reimbursed if recipients of those funds were "available to the

16 person for the same purpose from another source."   42 U.S.C. §

17 5155.   See also Hawaii v. FEMA, 294 F.3d at 1158.   Here, in

18 contrast, although Congress was doubtless aware that at least some

19 employers would have business interruption insurance, Congress did

20 not require reimbursement of the Tax Credit in the statute.   Thus,

21 it appears that through the Tax Credit Congress intended to give

22 companies an incentive to retain the employees during the recovery

23 period.

24    Because the Tax Credit was conceived as an incentive to retain

25 employees rather than compensation for a loss, the court finds that

26 the Tax Credit was not a "recovery" or "collection for such loss

27 from others" under the Policies and GRANTS summary judgment in

28 favor of Northrop on this issue.   Having granted summary judgment

on this issue, the court need not consider Northrop's other two arguments against offset.

**B. Payments from the Navy**

Northrop argues that Factory Mutual may not offset certain payments that the Navy has made to Northrop.  The parties agree that Factory Mutual is entitled to a credit for amounts that the Navy was contractually obligated to pay to Northrop.  Northrop appears to maintain that it has already accounted for all Navy payments and deducted them from its claim, and that in any event, the Navy did not pay it more than it was contractually obligated to pay when escalation payments are taken into account.  Factory Mutual disputes that the Navy paid only its contractually obligated fee, and also points out that Northrop has not indicated the precise claim from which the Navy payments have been deducted.

The court finds that because this issue is bound up in disputed questions of methodology of calculating Northrop's loss, this issue is better suited for trial than for summary judgment. The court therefore DENIES summary judgment.

**IV. DISCUSSION OF FACTORY MUTUAL'S MOTION**

Factory Mutual moves to dismiss Northrop's Time Element claim because the claim is not limited to loss resulting from insured physical loss or damage, or, in the alternative, seeks a declaration that Northrop's recovery under the Excess Policy is limited to the Time Element loss that Northrop can establish was a direct result of physical loss or damage and that Northrop bears the burden to tie its claimed Time Element losses directly to the insured physical loss or damage.  Factory Mutual also moves to

11

dismiss the Time Element claim for ships 18-21 because Northrop did

not actually sustain a loss for those ships.

### A. Time Element Claim

#### 1. Policy Language

The Excess Policy provides coverage for both property damage

and Time Element loss.  The Time Element coverage is as follows:

> A.   This Policy insures TIME ELEMENT loss, as provided
>      in the TIME ELEMENT COVERAGES, directly resulting
>      from physical loss or damage of the type insured by
>      this Policy:
>      1)   to property described elsewhere in this Policy
>           and not otherwise excluded by this Policy or
>           otherwise limited in the TIME ELEMENT COVERAGES
>           below;
>      2)   used by the Insured, or for which the Insured
>           has contracted use;
>      3)   located at an Insured Location; or
>      4)   while in transit as provided by this Policy,
>           and
>      5)   during the Periods of Liability described in
>           this section.

(Factory Mutual Mot., Exh. 1A, Appx. p. 0023.)

The Primary Policy also provides coverage for Business

Interruption as follows:

> Loss due to the necessary interruption of business
> conducted by the Insured including all interdependencies
> between or among companies owned or operated by the
> Insured caused by physical loss or damage insured herein
> during the term of this policy to real and/or personal
> property described in Clause 7.A.

(Northrop Mot., Exh. B at 16.)

Northrop argues that although the Excess Policy requires the

Time Element loss to result directly from property damage, that

property damage need only be "damage of the type insured" by

Factory Mutual, and not necessarily damage to insured property.  On

this argument, if there were damage to property that was not owned

by Northrop and not insured by Factory Mutual but that met one of

criteria (1) through (4) and criterion (5), and if this damage resulted in Time Element loss for Northrop, the Excess Policy would cover it.

Factory Mutual does not contest this interpretation of the Policy.  Factory Mutual insists only that Northrop can recover for Time Element loss only if that loss arises from some insured physical damage.  The court agrees with Factory Mutual that both the Excess Policy and the Primary Policy require Time Element or Business Interruption losses to be the direct result of insured physical loss or damage.[1]  Time Element or Business Interruption losses not connected to physical loss or damage are not subject to coverage under these Policies.

The court also agrees with Factory Mutual that the language of "directly resulting" requires that there be a causal link between the insured property damage and the claimed Time Element loss. See, e.g., Syufy Enterprises v. Home Ins. Co. of Indiana, No.94-0756, 1995 WL 129229 at *2 (N.D. Cal. March 21, 1995)(excluding

---

[1]By "insured physical damage" or "insured property damage," the court means property damage as specified in the Time Element insurance provision, which, as Northrop discusses, apparently includes damage to property that in a strict sense may not be considered "insured property."  For instance, hypothetically, if a shipyard is insured and there is damage to a vehicle not covered by the policy but parked at the shipyard, resulting in time element loss, the physical damage resulting in the time element loss would not strictly speaking be damage to "insured property." Nonetheless, it could be a source of Time Element loss covered by the Excess Policy here under category (2) or (3) (covering Time Element loss resulting from property "used by the insured" or property "located at an Insured Location.").  The court thus uses the term "insured property damage" as a shorthand for physical damage that will result in Time Element coverage if it causes a relevant loss, as defined in the Policies. "Insured property damage" need not be damage to property covered by the Policy; it must simply be property which, when damaged, could give rise to a covered Time Element loss claim.

coverage for business interruption loss due to curfews following the Rodney King trial because the "requisite causal link between damage to adjacent property and denial of access to a Syufy theater is absent. Syufy opted to close its theaters as a direct result of the city-wide curfews, not as a result of adjacent property damage.").

The court does not credit Northrop's argument that the Primary Policy has a looser causation requirement than the Excess Policy because the Primary Policy does not use the word "directly." Both Policies are clear in linking the non-physical loss to physical loss or damage. Because the court finds that the policies have the same coverage in this respect, the court also rejects Northrop's argument that Time Element loss that is not caused by physical damage will be covered by the Primary Policy.

## 2. Burden to demonstrate causal link

Factory Mutual argues that Northrop bears the burden to demonstrate the causal link between insured property damage and its claimed Time Element losses. Factory Mutual acknowledges that in a previous order the court determined that Factory Mutual bears the burden to segregate covered damage from excluded damage because the Excess Policy insures all risks except those excluded. Factory Mutual nonetheless asserts that Northrop has the burden to establish its claim for Time Element loss because it is a condition of coverage, not an exclusion. Northrop argues that the court's previous order that Factory Mutual has the burden to prove exclusion under the Excess Policy should also apply here. Additionally, Northrop accuses Factory Mutual of attempting to hold

it to an impossible burden of demonstrating its precise loss with "complete precision."

The court finds that Northrop has the burden of proving that its claims are covered by the Policy.  "The insured has the burden of establishing that a claim, unless specifically excluded, is within basic coverage, while the insurer has the burden of establishing that a specific exclusion applies."  Minkler v. Safeco Ins. Co. of Am., 49 Cal. 4th 315, 322 (2010), opinion after certified question answered sub nom. Minkler v. Safeco Ins. Co., 399 F. App'x 230 (9th Cir. 2010).  The Excess Policy covers Time Element loss "directly resulting from" certain types of property damage.  Although the Excess Policy is itself an all-risk policy, only certain types of Time Element loss are covered.  The Excess Policy identifies the covered Time Element loss by requiring that such loss directly result from certain types of property loss.  The required connection to physical damage functions as a condition of coverage, rather than an exclusion.  See Leprino Foods Co. v. Factor Mut. Ins. Co., 453 F.3d 1281, 1287 (10th Cir. 2006)(internal citation and quotation marks omitted, emphasis added) (Under Colorado law, "[u]nder an all-risk policy, once the insured demonstrates a loss to the property covered by the policy, the insurance carrier has the burden of proving that the proximate cause of the loss was excluded by the policy language.").

In its previous order the court found that it was Factory Mutual's burden to justify exclusions because the policy was an all-risk policy that insured Northrop against all risks of physical loss, subject only to certain specific exclusions.  Northrop Grumman Corp. v. Factory Mut. Ins. Co., 805 F. Supp. 2d 945 (C.D.

Cal. 2011).   The court found that according to the provisions of the policy,  "where more than one coverage applies, the Primary Policies apply first to those coverages or perils not insured by the Excess Policy."  <u>Id.</u> at 954.   Here, in contrast, the requirement that Time Element loss directly result from insured property damage functions as a condition of coverage, and the burden remains on the insured to establish that its loss falls within the coverage.   The court's previous holding is therefore not implicated here.

     The court rejects Northrop's argument that any Time Element loss not covered by the Excess Policy will be covered by the Primary Policy.   As discussed above, both the Excess and Primary Policies require that time element or business interruption loss be tied to property damage or loss.   Thus any time element damage not covered in the Excess Policy is highly unlikely to be covered by the Primary Policy.   For this reason, the burden is a burden of demonstrating coverage, not exclusion, and the burden falls, as is typical, upon the insured.

### 3. Northrop's Claim

     Factory Mutual offers evidence of a number of ways in which Northrop's claimed Time Element loss is not tied to physical loss or damage.   Factory Mutual acknowledges that Northrop did remove some "non-Katrina impacts" before making its Time Element claim. (Exh. 2-S, Spiker Depo, Appx. p. 0813.)   However, Northrop's former CFO and designated corporate representative Bob Spiker testified that the methodology included "impacts that are not just a result of physical damage to the yard from Hurricane Katrina" including "[l]abor impacts.   Impacts to our work force and ability to hire

after Katrina.  And impacts of – from Navy property that the Navy paid the property damage but yet cost disruption in a production." (Id. at 818-819.)  Northrop's expert Cheryl LeeVan stated in her report:

> Northrop did not identify and I did not attempt to adjust Northrop's Hurricane Katrina lost profits claim for profit impacts, if any, that were caused by the impact of Hurricane Katrina upon Northrop's operations, yet not caused by Northrop's Hurricane Katrina property damage. I was requested to assume the lost profits I measure are covered by Northrop's insurance policies, as is Northrop's contention.

(Exh. 2B at Appx. p. 0211.)

The types of impacts claimed as loss by Northrop that according to Factory Mutual are unrelated to insured physical loss or damage include (1) post-Katrina labor shortages that affected Northrop's ability to build ships following the storm, including inconsistent return of labor to yards, supplementing Polar E workforce with workers unfamiliar with Polar E  (Factory Mutual Exh. 2-C, Appx. pp. 0455, 0459, 0461)(Hendry Report), thus increasing Northrop's costs and delaying its schedule; (2) pre-Katrina issues with various ship programs that continued to affect ship costs and schedules; (3) inconsistent Navy funding; and (4) Northrop's work on other ships in the yards but not included in the claim.

Northrop challenges these claims.  Northrop asserts that (1) it has demonstrated loss due to labor shortages that was related to property damage (see e.g., Teel Depo 146:18-147:14; Hendry Decl. ¶ 31); (2) it removed all pre-Katrina issues from its claim (LeeVan Decl. ¶¶ 9, 19, 21); (3) it removed all effects of inconsistent Navy funding from the claim, (LeeVan Decl., ¶ 9, Exh. D, LeeVan

Report at 56-67) and (4) the impacts on ships in other yards are related to insured property damage (Hendry Decl. ¶¶ 23, 27, 34.).

The court finds that there are triable issues of fact as to whether Northrop has met its burden in demonstrating that its Time Element claim results from insured physical loss or damage.  This question implicates other factual questions concerning the credibility of the potentially conflicting accounting methodologies employed by the parties, and whether Northrop's top-down accounting approach appropriately identified the Time Element loss caused by insured physical damage.  <u>See, e.g.</u> Exh. B., Hendry Report ¶¶ 5.3-5.6.  Given the disputed methodologies, it is inappropriate for the court to grant summary judgment on this issue.  Evaluating the credibility of the expert reports will be a question for the fact-finder.  Whether Northrop has met its burden of tying its Time Element loss to physical damage as required by the Policy will depend on the weight the jury gives to the parties' respective methodologies for calculating that loss.

### 4. Conclusion on Time Element

Factory Mutual asks, in the alternative, for the court to find that Northrop's recovery is limited to the Time Element loss that Northrop can establish was a direct result of physical loss or damage and that Northrop bears the burden to establish the causal link.  The court agrees with Factory Mutual's interpretation of the policy and burden and finds it appropriate to issue a declaration that (1) Time Element loss not directly resulting from physical loss or damage is not covered under the Excess Policy, and (2) it is Northrop's burden to establish this causal link with respect to all of its claimed Time Element losses.

**B. Time Element Claim for Ships LPD 18-21**

The court has requested supplemental briefing on this issue and will rule on it in a separate order.

**V. CONCLUSION**

For the reasons stated above, the court GRANTS summary judgment in favor of Northrop with respect to the offset of the tax credit and DENIES Northrop summary judgment with respect to the Navy payments.  The court GRANTS Factory Mutual's Motion for a declaration that under the Policies (1) Time Element loss not directly resulting from physical loss or damage is not covered under the Excess Policy, and (2) it is Northrop's burden to establish this causal link with respect to all of its claimed Time Element losses.  The court has requested supplemental briefing on Factory Mutual's Motion regarding LPD 18-21 and will rule on that issue in a separate order.


IT IS SO ORDERED.



Dated: July 18, 2013

DEAN D. PREGERSON

United States District Judge