1

2

3                                                                  O

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11   NORTHROP GRUMMAN              )   Case No. CV 05-08444 DDP (PLAx)
     CORPORATION,                  )
12                                 )   **AMENDED** ORDER GRANTING IN PART
                       Plaintiff,  )   **AND DENYING IN PART NORTHROP'S**
13                                 )   **MOTION FOR SUMMARY JUDGMENT AND**
          v.                       )   **GRANTING FACTORY MUTUAL'S MOTION**
14                                 )   **FOR DECLARATION**
     FACTORY MUTUAL INSURANCE      )
15   COMPANY,                      )   [Dkt. Nos. 429 & 439]
                                   )
16                     Defendant.  )
                                   )
17   _____)

18        Presently before the court are Plaintiff Northrop Grumman's

19   Motion for Partial Summary Judgment and Defendant Factory Mutual

20   Insurance Company's Phase II Motion for Summary Judgment.  Having

21   considered the parties' submissions and heard oral argument, the

22   court adopts the following order.

23   **I. BACKGROUND**

24        Northrop Grumman Corporation ("Northrop") is a global defense

25   contractor.  Northrop operates shipyards and facilities throughout

26   the Gulf Coast.  Its Mississippi subsidiary, Northrop Grumman Ship

27   Systems, is headquartered in Pascagoula, Mississippi.  Northrop's

28   shipbuilding business consists of two primary shipyards in

1   Pascagoula and New Orleans, Louisiana ("Avondale").  In or about
2   1999, Northrop acquired a company which had acquired Avondale.  As
3   part of the acquisition, Northrop acquired contracts with the Navy
4   and Coast Guard for the construction of ships including LHD-8,
5   LPDs, DDGs, and NSCs.  The Avondale yard was also finalizing
6   delivery of a commercial ship program called Polar.

7        For the April 1, 2005, to April 1, 2006, policy year, Northrop
8   purchased approximately $20 billion in all risk property insurance.
9   Northrop's 2005-2006 property insurance program consists of two
10  layers.  The first layer consists of a $500 million layer of
11  primary coverage (the "Primary Layer").  The Primary Layer is
12  comprised of approximately 30 policies.  Factory Mutual Insurance
13  Company ("Factory Mutual") issued one of the Primary Layer's
14  policies (the "Factory Mutual Primary Policy" or "Primary Policy").

15       The Factory Mutual Primary Policy is an "all risk" policy.
16  The Primary Policy defines certain perils including "Flood."  The
17  second layer is the excess layer (the "Excess Policy").  The Excess
18  Policy is a single all risk policy sold to Northrop by Factory
19  Mutual.  The Excess Policy provides approximately $20 billion worth
20  of coverage for losses in excess of $500 million.  The Excess
21  Policy contains an exclusion for flood.  The Limits of Liability
22  provision in the Primary Layer states that the Excess Policy's $500
23  million attachment point is subject to the Excess of Loss
24  provisions.  The Excess of Loss provisions state that when a loss
25  was caused by both covered and excluded losses, the Primary
26  Policies are deemed to apply first to the excluded losses.

27       The Primary Policy provides a number of time element coverages
28  to indemnify Northrop for financial and economic losses that result

from property damage.  The Excess Policy also provides coverage for

property damage and Time Element coverage.  With regard to Time

Element coverage, the Excess Policy states as follows:

> A.   This Policy insures TIME ELEMENT loss, as
>      provided in the TIME ELEMENT COVERAGES,
>      directly resulting from physical loss or damage
>      of the type insured by this Policy:
>      1)   to property described elsewhere in
>           this Policy and not otherwise exclude
>           by this Policy or otherwise limited
>           in the TIME ELEMENT COVERAGES below;
>      2)   used by the Insured, or for which the
>           Insured has contracted use;
>      3)   located at an Insured Location; or
>      4)   while in transit as provided by this
>           Policy, and
>      5)   during the Periods of Liability
>           described in this section.

(Chris B. Roza Decl. Exh. 1-A.)

The Time Element Coverages in the Excess Policy are defined

and include the loss of gross earnings as follows:

> 1)   Measurement of Loss:
>      a)   The recoverable GROSS EARNINGS loss is the
>           Actual Loss Sustained by the Insured of
>           the following during the PERIOD OF
>           LIABILITY:
>           (i)   Gross Earnings;
>           (ii)  less all charges and expenses
>                 that do not necessarily continue
>                 during the interruption of
>                 production or suspension of
>                 business operations or services;
>           (iii) plus all other earnings derived from the
>                 operation of the business.

(_Id._)  Gross Earnings for manufacturing operations are defined as

"the net sales value of production less the cost of all raw stock,

materials and supplies used in such production."  (_Id._)

In August 2005, Hurricane Katrina struck the Gulf Coast region

and caused significant damage.  Northrop's Pascagoula shipyard was

in the process of building ships LHD-8, LPD 17 and 19, DDG 100,

103, 105, 107, and 110, and NSC 1 and 2.  (Hendry Report, §§ 2, 3;

3

1  LeeVan Report at pp. 7, 10; Yount Depo at 40:1-11. )  The Avondale

2  shipyard was finalizing Polar E and building LPD 18, 20, and 21.

3  (Id.)  Although each of the ships had a primary building location,

4  portions of some of the ships were assigned to other Gulf Coast

5  shipyards as well.  (Hendry Report, §§ 2, 3; 2013 Lee Van Depo at

6  35:17-37:5; Yount Depo at 87:8-14.)

7       It is undisputed that, at the time of Hurricane Katrina, the

8  contract in place for LPDs 18-20 was a cost plus award fee

9  contract, and the contract for LPD 21 was a cost plus incentive fee

10 contract, and that under these types of contracts, Northrop was

11 entitled to reimbursement from the Navy for allowable costs

12 incurred to build the ship, including overhead costs.  When

13 Hurricane Katrina struck, Northrop was not entitled to any

14 incentive fees on the LPDs 18-20.

15      It is also undisputed that between 2005 and 2009, Northrop

16 received federal income tax relief pursuant to the Katrina

17 Emergency Tax Relief Act of 2005 and the Gulf Opportunity Zone Act

18 of 2005.  Factory Mutual's sixteenth affirmative defense asserts an

19 offset to Northrop's insurance claim of approximately $9.4 million

20 based on the federal income tax credit.

21      Northrop moves for summary judgment on Factory Mutual's

22 sixteenth Affirmative Defense, arguing that there should be no

23 offset of the Tax Credit or of certain payments from the Navy.

24      Factory Mutual moves for summary judgment on Northrop's Time

25 Element claim, (1) arguing that it is entitled to summary judgment

26 because Northrop has failed to tie its Time Element claim to

27 property damage or loss or seeking, in the alternative, a

28 declaration that all Time Element loss must result from property

1  damage or loss and that it is Northrop's burden to demonstrate as

2  much, and (2) arguing that it is entitled to summary judgment on

3  Northrop's Time Element claims for ships LPD 18-21 because Northrop

4  was fully compensated for those ships by the Navy.

5  **II. LEGAL STANDARD**

6       Summary judgment is appropriate where the pleadings,

7  depositions, answers to interrogatories, and admissions on file,

8  together with the affidavits, if any, show "that there is no

9  genuine dispute as to any material fact and the movant is entitled

10 to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party

11 seeking summary judgment bears the initial burden of informing the

12 court of the basis for its motion and of identifying those portions

13 of the pleadings and discovery responses that demonstrate the

14 absence of a genuine dispute of material fact.  Celotex Corp. v.

15 Catrett, 477 U.S. 317, 323 (1986).  All reasonable inferences from

16 the evidence must be drawn in favor of the nonmoving party.  See

17 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

18 If the moving party does not bear the burden of proof at trial, it

19 is entitled to summary judgment if it can demonstrate that "there

20 is an absence of evidence to support the nonmoving party's case."

21 Celotex, 477 U.S. at 325.

22      Once the moving party meets its burden, the burden shifts to

23 the nonmoving party opposing the motion, who must "set forth

24 specific facts showing that there is a genuine issue for trial."

25 Anderson, 477 U.S. at 256.  Summary judgment is warranted if a

26 party "fails to make a showing sufficient to establish the

27 existence of an element essential to that party's case, and on

28 which that party will bear the burden of proof at trial." Celotex,

477 U.S. at 322.  A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

It is not the court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).  Counsel has an obligation to lay out their support clearly. Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." Id.

**III. DISCUSSION OF NORTHROP'S MOTION**

Northrop argues that it is entitled to summary judgment on Factory Mutual's sixteenth affirmative defense, according to which Northrop's claim should be reduced by (1) approximately 9.4 million of the federal income tax credits that Northrop received, and (2) payments from the Navy.

**A.   Offset of Tax Credit**

The Factory Mutual Primary Policy includes "Business Interruption - Gross Earnings" coverage.  The parties do not dispute that as part of the adjustment of Northrop's loss, Factory Mutual agreed to treat as covered under the Primary Layer the total amount of retention pay that Northrop paid to its employees ($38

1   million) during the period Northrop's business was inoperable due

2   to Hurricane Katrina.   The parties also do not dispute that

3   Northrop received a tax credit totaling nearly $9.4 million (the

4   "Tax Credit").   Northrop obtained the Tax Credit from Sections 201

5   and 202 of the Katrina Emergency Tax Relief Act of 2005 and the

6   Gulf Opportunity Zone, which allowed eligible employers to receive

7   a tax credit of 40% of the first $6,000 in wages paid to each

8   eligible current employee (i.e. $2,400) immediately after the

9   storm.   Pub. L. No. 109-73 § 202, 119 Stat. 2021, 2021-22 (2005),

10  as amended by Pub L. No. 109-135, § 201, 119 Stat. 2596, 2602

11  (2005)(codified at 26 U.S.C. § 1400R(2006)).

12      Both the Primary Policy and the Excess Policy have provisions

13  allowing offsets.   The Primary Policy contains the following

14  "Salvage and Recoveries" provision:

15
16          Except as described in Clause 27, after expenses incurred
            in salvage or recovery are deducted, any salvage or other
            recovery, except recovery through subrogation proceedings
17          and/or from underlying and/or excess insurance as
            described herein, shall accrue entirely to the benefit of
18          the Insurer until the sum paid by the Insurer has been
            recovered.
19
20  (Northrop Exh. B, pp.42-43, ¶ 28.)   The Excess Policy contains the

21  following "Collection from Others" provision:

            The Company will not be liable for any loss to the extent
22          that the Insured has collected for such loss from others.

23  (Northrop Exh. C, p. 105, § D, ¶ 6.)

24      Factory Mutual argues that the Tax Credit falls within both

25  the "Salvages and Recoveries" provision and the "Collection from

26  Others" provision.   According to Factory Mutual, the Tax Credit

27  constitutes a recovery for the retention pay, and Factory Mutual is

28  entitled to offset $9.4 million of the $38 million that Northrop

spent on retention pay.  Northrop contends that the Tax Credit does not constitute a recovery and should not be offset from Factory Mutual's retention pay payment.

Factory Mutual points to a case from the Virginia Supreme Court where the court found that an insurance company could offset federal funds because those funds constituted a recovery.  PMA Capital Insurance Company v. US Airways, Inc., 271 Va. 352, 360-61 (2006).  The case concerned funding provided under the Air Transportation Safety and System Stabilization Act ("Stabilization Act"), which was enacted after 9/11 to "compensate air carriers . . . for both 'direct losses' as a result of 'any Federal ground stop order' and 'incremental losses' as a 'direct result of' the September 11, 2011, terrorist attacks."  Id. at 359 (quoting the Stabilization Act).  The court found that those funds were a form of "recoveries" under the policy because they met the definition of "recovery" as "the regaining or restoration of something lost or taken away."  Id. at 360 (citing Black's Law Dictionary 1302 (8th ed. 2004)).

Factory Mutual argues that here, as in PMA, the $9.4 million tax credit is a "recovery" by Northrop of a portion of the $38 million retention pay that Factory Mutual has treated as covered under the primary layer.  The amount of the Tax Credit depended directly on the amount Northrop spent in retention pay.  Emergency Tax Relief Act of 2005, PL 109-73, §§ 201-202, September 23, 2005, 119 Stat 2016 (allowing eligible employers to receive a tax credit of 40% of the first $6,000 in wages paid to each eligible current employee).  The Tax Credit thus, according to Factory Mutual, is a recovery of a portion of the amount it paid in retention pay.  If

8

1  Northrop were to retain the Tax Credit as well as the full $38
2  million in retention pay from Factory Mutual, Northrop would end up
3  with over $47 million recovery for retention, when it only paid out
4  $38 million, which Factory Mutual calls a windfall.

5      The court finds this situation to be factually distinguishable
6  from PMA.  Unlike the Stabilization Act in PMA, the Tax Credit here
7  was intended as an incentive for employers to retain employees, not
8  as a compensation for loss.  As one congressman put it, "[s]everal
9  of these provisions . . . help businesses, help employers; and, of
10  course, we are trying to encourage employers in these affected
11  areas to bring workers back and to create jobs so that people can
12  come back and have an income."  151 Cong. Rec. H8189-01 (2005)
13  (statement of Cong. McCrery)).  See also 151 Cong. Rec. S13702-01
14  (2005)(statement of Sen. Baucus)("We must encourage individuals to
15  return.  And this means that there must be jobs for them to return
16  to.  This legislation gives businesses help to create those
17  jobs."), and 151 Cong. Rec. H8014, H8018 (daily ed. Sept. 15,
18  2005)(statement of Cong. Jefferson)("[T]he Katrina Emergency Tax
19  Relief Act also provides targeted incentives for returning
20  businesses and new businesses to employ the thousands of
21  hardworking Americans who have been displaced or lost jobs to
22  Hurricane Katrina.").  The relevant section is entitled "Employee
23  Retention Credit for Employers Affected by Hurricane Katrina,"
24  which emphasizes a credit rather than compensation for a loss.  For
25  these reasons, the court finds that the Tax Credit is not a
26  "recovery" or a "collection from others" in the sense of the Policy
27  because it is not a compensation for a loss but instead an
28  incentive to encourage employee retention.

1       This holding is consistent with the FEMA cases discussed by

2  both parties, Hawaii v. FEMA, 294 F.3d 1152 (9th Cir. 2002), and

3  Kiln Underwriting Ltd. v. Jesuit High School of New Orleans, No.

4  06-4350, 2008 WL 4724390 (E.D. La. Oct. 24, 2008).  The FEMA cases

5  concern the government's power to obtain reimbursement when FEMA

6  funds recipients later receive compensation from private insurance

7  policies.  The cases emphasize Congress's intent in the FEMA

8  statute to create incentives for companies to obtain private

9  insurance instead of depending on federal FEMA funds in the case of

10  disaster.  See, e.g. Hawaii v. FEMA, 294 F.3d at 1163 ("Congress'

11  concern, then, was that when there was the safety net of federal

12  disaster relief, covered parties and insurers were not seeking or

13  providing insurance coverage as they otherwise would.").  In the

14  FEMA statute, Congress explicitly required FEMA funds to be

15  reimbursed if recipients of those funds were "available to the

16  person for the same purpose from another source."  42 U.S.C. §

17  5155.  See also Hawaii v. FEMA, 294 F.3d at 1158.  Here, in

18  contrast, although Congress was doubtless aware that at least some

19  employers would have business interruption insurance, Congress did

20  not require reimbursement of the Tax Credit in the statute.  Thus,

21  it appears that through the Tax Credit Congress intended to give

22  companies an incentive to retain the employees during the recovery

23  period.

24       Because the Tax Credit was conceived as an incentive to retain

25  employees rather than compensation for a loss, the court finds that

26  the Tax Credit was not a "recovery" or "collection for such loss

27  from others" under the Policies and GRANTS summary judgment in

28  favor of Northrop on this issue.  Having granted summary judgment

on this issue, the court need not consider Northrop's other two arguments against offset.

### B. Payments from the Navy

Northrop argues that Factory Mutual may not offset certain payments that the Navy has made to Northrop.  The parties agree that Factory Mutual is entitled to a credit for amounts that the Navy was contractually obligated to pay to Northrop.  Northrop appears to maintain that it has already accounted for all Navy payments and deducted them from its claim, and that in any event, the Navy did not pay it more than it was contractually obligated to pay when escalation payments are taken into account.  Factory Mutual disputes that the Navy paid only its contractually obligated fee, and also points out that Northrop has not indicated the precise claim from which the Navy payments have been deducted.

The court finds that because this issue is bound up in disputed questions of methodology of calculating Northrop's loss, this issue is better suited for trial than for summary judgment. The court therefore DENIES summary judgment.

## IV. DISCUSSION OF FACTORY MUTUAL'S MOTION

Factory Mutual moves to dismiss Northrop's Time Element claim because the claim is not limited to loss resulting from insured physical loss or damage, or, in the alternative, seeks a declaration that Northrop's recovery under the Excess Policy is limited to the Time Element loss that Northrop can establish was a direct result of physical loss or damage and that Northrop bears the burden to tie its claimed Time Element losses directly to the insured physical loss or damage.  Factory Mutual also moves to

dismiss the Time Element claim for ships 18-21 because Northrop did not actually sustain a loss for those ships.

## A. Time Element Claim

### 1. Policy Language

The Excess Policy provides coverage for both property damage and Time Element loss. The Time Element coverage is as follows:

> A. This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured by this Policy:
> 1) to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below;
> 2) used by the Insured, or for which the Insured has contracted use;
> 3) located at an Insured Location; or
> 4) while in transit as provided by this Policy, and
> 5) during the Periods of Liability described in this section.

(Factory Mutual Mot., Exh. 1A, Appx. p. 0023.)

The Primary Policy also provides coverage for Business Interruption as follows:

> Loss due to the necessary interruption of business conducted by the Insured including all interdependencies between or among companies owned or operated by the Insured caused by physical loss or damage insured herein during the term of this policy to real and/or personal property described in Clause 7.A.

(Northrop Mot., Exh. B at 16.)

Northrop argues that although the Excess Policy requires the Time Element loss to result directly from property damage, that property damage need only be "damage of the type insured" by Factory Mutual, and not necessarily damage to insured property. On this argument, if there were damage to property that was not owned by Northrop and not insured by Factory Mutual but that met one of

criteria (1) through (4) and criterion (5), and if this damage resulted in Time Element loss for Northrop, the Excess Policy would cover it.

Factory Mutual does not contest this interpretation of the Policy.  Factory Mutual insists only that Northrop can recover for Time Element loss only if that loss arises from some insured physical damage.  The court agrees with Factory Mutual that both the Excess Policy and the Primary Policy require Time Element or Business Interruption losses to be the direct result of insured physical loss or damage.[1]  Time Element or Business Interruption losses not connected to physical loss or damage are not subject to coverage under these Policies.

The court also agrees with Factory Mutual that the language of "directly resulting" requires that there be a causal link between the insured property damage and the claimed Time Element loss. See, e.g., Syufy Enterprises v. Home Ins. Co. of Indiana, No.94-0756, 1995 WL 129229 at *2 (N.D. Cal. March 21, 1995)(excluding

---

[1]By "insured physical damage" or "insured property damage," the court means property damage as specified in the Time Element insurance provision, which, as Northrop discusses, apparently includes damage to property that in a strict sense may not be considered "insured property."  For instance, hypothetically, if a shipyard is insured and there is damage to a vehicle not covered by the policy but parked at the shipyard, resulting in time element loss, the physical damage resulting in the time element loss would not strictly speaking be damage to "insured property." Nonetheless, it could be a source of Time Element loss covered by the Excess Policy here under category (2) or (3) (covering Time Element loss resulting from property "used by the insured" or property "located at an Insured Location.").  The court thus uses the term "insured property damage" as a shorthand for physical damage that will result in Time Element coverage if it causes a relevant loss, as defined in the Policies. "Insured property damage" need not be damage to property covered by the Policy; it must simply be property which, when damaged, could give rise to a covered Time Element loss claim.

coverage for business interruption loss due to curfews following the Rodney King trial because the "requisite causal link between damage to adjacent property and denial of access to a Syufy theater is absent. Syufy opted to close its theaters as a direct result of the city-wide curfews, not as a result of adjacent property damage.").

The court does not credit Northrop's argument that the Primary Policy has a looser causation requirement than the Excess Policy because the Primary Policy does not use the word "directly." Both Policies are clear in linking the non-physical loss to physical loss or damage. Because the court finds that the policies have the same coverage in this respect, the court also rejects Northrop's argument that Time Element loss that is not caused by physical damage will be covered by the Primary Policy.

### 2. Burden to demonstrate causal link

Factory Mutual argues that Northrop bears the burden to demonstrate the causal link between insured property damage and its claimed Time Element losses. Factory Mutual acknowledges that in a previous order the court determined that Factory Mutual bears the burden to segregate covered damage from excluded damage because the Excess Policy insures all risks except those excluded. Factory Mutual nonetheless asserts that Northrop has the burden to establish its claim for Time Element loss because it is a condition of coverage, not an exclusion. Northrop argues that the court's previous order that Factory Mutual has the burden to prove exclusion under the Excess Policy should also apply here. Additionally, Northrop accuses Factory Mutual of attempting to hold

it to an impossible burden of demonstrating its precise loss with
"complete precision."

The court finds that Northrop has the burden of proving that
its claims are covered by the Policy.  "The insured has the burden
of establishing that a claim, unless specifically excluded, is
within basic coverage, while the insurer has the burden of
establishing that a specific exclusion applies."  Minkler v. Safeco
Ins. Co. of Am., 49 Cal. 4th 315, 322 (2010), opinion after
certified question answered sub nom. Minkler v. Safeco Ins. Co.,
399 F. App'x 230 (9th Cir. 2010).  The Excess Policy covers Time
Element loss "directly resulting from" certain types of property
damage.  Although the Excess Policy is itself an all-risk policy,
only certain types of Time Element loss are covered.  The Excess
Policy identifies the covered Time Element loss by requiring that
such loss directly result from certain types of property loss.  The
required connection to physical damage functions as a condition of
coverage, rather than an exclusion.  See Leprino Foods Co. v.
Factor Mut. Ins. Co., 453 F.3d 1281, 1287 (10th Cir. 2006)(internal
citation and quotation marks omitted, emphasis added) (Under
Colorado law, "[u]nder an all-risk policy, once the insured
demonstrates a loss to the property covered by the policy, the
insurance carrier has the burden of proving that the proximate
cause of the loss was excluded by the policy language.").

In its previous order the court found that it was Factory
Mutual's burden to justify exclusions because the policy was an
all-risk policy that insured Northrop against all risks of physical
loss, subject only to certain specific exclusions.  Northrop
Grumman Corp. v. Factory Mut. Ins. Co., 805 F. Supp. 2d 945 (C.D.

Cal. 2011).  The court found that according to the provisions of the policy, "where more than one coverage applies, the Primary Policies apply first to those coverages or perils not insured by the Excess Policy." Id. at 954.  Here, in contrast, the requirement that Time Element loss directly result from insured property damage functions as a condition of coverage, and the burden remains on the insured to establish that its loss falls within the coverage.  The court's previous holding is therefore not implicated here.

The court rejects Northrop's argument that any Time Element loss not covered by the Excess Policy will be covered by the Primary Policy.  As discussed above, both the Excess and Primary Policies require that time element or business interruption loss be tied to property damage or loss.  Thus any time element damage not covered in the Excess Policy is highly unlikely to be covered by the Primary Policy.  For this reason, the burden is a burden of demonstrating coverage, not exclusion, and the burden falls, as is typical, upon the insured.

### 3. Northrop's Claim

Factory Mutual offers evidence of a number of ways in which Northrop's claimed Time Element loss is not tied to physical loss or damage.  Factory Mutual acknowledges that Northrop did remove some "non-Katrina impacts" before making its Time Element claim. (Exh. 2-S, Spiker Depo, Appx. p. 0813.)  However, Northrop's former CFO and designated corporate representative Bob Spiker testified that the methodology included "impacts that are not just a result of physical damage to the yard from Hurricane Katrina" including "[l]abor impacts.  Impacts to our work force and ability to hire

16

after Katrina.  And impacts of - from Navy property that the Navy paid the property damage but yet cost disruption in a production." (Id. at 818-819.)  Northrop's expert Cheryl LeeVan stated in her report:

> Northrop did not identify and I did not attempt to adjust Northrop's Hurricane Katrina lost profits claim for profit impacts, if any, that were caused by the impact of Hurricane Katrina upon Northrop's operations, yet not caused by Northrop's Hurricane Katrina property damage. I was requested to assume the lost profits I measure are covered by Northrop's insurance policies, as is Northrop's contention.

(Exh. 2B at Appx. p. 0211.)

The types of impacts claimed as loss by Northrop that according to Factory Mutual are unrelated to insured physical loss or damage include (1) post-Katrina labor shortages that affected Northrop's ability to build ships following the storm, including inconsistent return of labor to yards, supplementing Polar E workforce with workers unfamiliar with Polar E  (Factory Mutual Exh. 2-C, Appx. pp. 0455, 0459, 0461)(Hendry Report), thus increasing Northrop's costs and delaying its schedule; (2) pre-Katrina issues with various ship programs that continued to affect ship costs and schedules; (3) inconsistent Navy funding; and (4) Northrop's work on other ships in the yards but not included in the claim.

Northrop challenges these claims.  Northrop asserts that (1) it has demonstrated loss due to labor shortages that was related to property damage (see e.g., Teel Depo 146:18-147:14; Hendry Decl. ¶ 31); (2) it removed all pre-Katrina issues from its claim (LeeVan Decl. ¶¶ 9, 19, 21); (3) it removed all effects of inconsistent Navy funding from the claim, (LeeVan Decl., ¶ 9, Exh. D, LeeVan

Report at 56-67) and (4) the impacts on ships in other yards are related to insured property damage (Hendry Decl. ¶¶ 23, 27, 34.).

The court finds that there are triable issues of fact as to whether Northrop has met its burden in demonstrating that its Time Element claim results from insured physical loss or damage.  This question implicates other factual questions concerning the credibility of the potentially conflicting accounting methodologies employed by the parties, and whether Northrop's top-down accounting approach appropriately identified the Time Element loss caused by insured physical damage.  See, e.g. Exh. B., Hendry Report ¶¶ 5.3-5.6.  Given the disputed methodologies, it is inappropriate for the court to grant summary judgment on this issue.  Evaluating the credibility of the expert reports will be a question for the fact-finder.  Whether Northrop has met its burden of tying its Time Element loss to physical damage as required by the Policy will depend on the weight the jury gives to the parties' respective methodologies for calculating that loss.

### 4. Conclusion on Time Element

Factory Mutual asks, in the alternative, for the court to find that Northrop's recovery is limited to the Time Element loss that Northrop can establish was a direct result of physical loss or damage and that Northrop bears the burden to establish the causal link.  The court agrees with Factory Mutual's interpretation of the policy and burden and finds it appropriate to issue a declaration that (1) Time Element loss not directly resulting from physical loss or damage is not covered under the Excess Policy, and (2) it is Northrop's burden to establish this causal link with respect to all of its claimed Time Element losses.

## B. Time Element Claim for Ships LPD 18-21

Factory Mutual seeks summary judgment on Northrop's Time Element claim for ships LPD 18-21, arguing that Northrop did not sustain an actual loss on those ships and therefore does not qualify for the Time Element coverage under the Excess Policy. Northrop asserts that it did sustain a loss for the ships despite the fact that it did not lose money on the particular contracts.

### 1. Policy Language

The Excess Policy provides that the insured can recover for Time Element loss "directly resulting from physical loss or damage of the type insured by this Policy" to certain specified property (as discussed above) within the period of liability.[2]  The recoverable Time Element loss is measured as follows:

> The recoverable GROSS EARNINGS loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:
>
> (i)     Gross Earnings;
> (ii)    less all charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations or services;
> (iii)   plus all other earnings derived from the operation of the business.

Excess Policy, Exh. 1-A to Factory Mutual's MSJ at Appx. pp. 22-23.

---

[2] Additionally, coverage is limited to situations where the insured is:
(i) wholly or partially prevented from producing goods or continuing business operations or services;
(ii) unable to make up lost production within a reasonable period of time, not limited to the period during which production is interrupted;
(iii) unable to continue such operations or services during the PERIOD OF LIABILITY; and
(iv) able to demonstrate a loss of sales for the operations, services or production prevented.
Excess Policy C.2.A.1.c.

"Gross earnings" are defined as follows:

a)  for manufacturing operations: the net sales value of production less the cost of all raw stock, materials and supplies used in such production; or

b)  for mercantile or non-manufacturing operation: the total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the Insured.

Id. at 23.  The parties agree that Northrop's operations fall under manufacturing operations.

In short, under the Excess Policy, the recoverable Time Element loss is the Actual Loss Sustained, calculated as the net sales value of production less the cost of material, less non-continuing expenses, plus all other earnings.

## 2. Calculation of "Actual Loss Sustained"

### a. Factory Mutual

Factory Mutual defines the "net sales value of production" as "the units produced times the net sales price received from the customer for the finished goods produced."  (Factory Mutual Supp. Brief at 5.)  According to Factory Mutual, "[n]et sales value is the net sales price that Northrop would receive from the customer for finished goods."  (Id. at 9 ¶ 2.)  Factory Mutual acknowledges that Northrop does not own the vessels or the materials used to build them,[3] and states that Northrop "essentially sells its labor hours used to build ships and receives funds from its customer for the work accomplished as determined by its contracts with its customers."  (Id. at 10 ¶ 4.a.)  Because Northrop did not lose any

---

[3]See James Doggett's Jan. 6, 2013 Depo. at pp. 48:1-49:19 (explaining that when Northrop purchases material, the material arrives at the shipyard, Northrop pays the invoice, and then invoices the government for the materials, at which point the materials become government property, such that the vast majority of the materials at the shipyard are owned by the government).

of its existing contracts and has not pointed to any other ship contracts lost due to physical loss or damage from Hurricane Katrina, Northrop cannot identify any lost sales, according to Factory Mutual.

### b. Northrop

Northrop objects to Factory Mutual's interpretation of Actual Loss, arguing that the result of such an interpretation would be that Northrop could never establish Time Element loss because of its cost-plus type of contract.  Cost-reimbursement types of contracts, including cost-plus contracts, are used "when uncertainties involved in contract performance do not permit costs to be estimated with sufficient accuracy to use any type of fixed-price contract," for instance, for contracts involving first-in-class ships and new designs.  (Exh. 2-B, LeeVan Report at 12, Appx. p. 0180.)

The LPD 18-21 contracts at issue here are cost-plus-incentive-fee contracts ("cost-plus contract").  Cost-plus contracts provide for the payment of allowable costs up to a certain ceiling.  48 C.F.R. 16.301-1.  They also "provide[] for an initially negotiated fee to be adjusted later by a formula based on the relationship of total allowable costs to total target costs."  48 C.F.R. § 16.304. See also 48 C.F.R. § 16.405 ("[The cost-plus-incentive-fee] contract type specifies a target cost, a target fee, minimum and maximum fees, and a fee adjustment formula. After contract performance, the fee payable to the contractor is determined in accordance with the formula. The formula provides, within limits, for increases in fee above target fee when total allowable costs are less than target costs, and decreases in fee below target fee

when total allowable costs exceed target costs. This increase or
decrease is intended to provide an incentive for the contractor to
manage the contract effectively. When total allowable cost is
greater than or less than the range of costs within which the fee-
adjustment formula operates, the contractor is paid total allowable
costs, plus the minimum or maximum fee.") In other words, cost-plus
contracts provide for reimbursement of Northrop's allowable costs
plus a fee that represents profit. (See Exh. 2-B, LeeVan Report at
12, Appx. p. 0180.)

     The LPD 18-21 contracts provided for some incentive fees if
Northrop met certain milestones, but as of the date of Hurricane
Katrina, Northrop had already missed those milestones for LPDs 18-
20, and thus was not entitled to any incentives for those ships.
(Exh. 2-F, Weldon Depo. Appx.p. 0543.)  LPD 21 was on a different
schedule and some incentives may have been available. (Id. Appx.
p. 0553.)

     It is undisputed that Northrop received payment from the Navy
for all increased costs incurred to build and deliver LPDs 18-21
due to the hurricane. (Id. ("We were reimbursed for the cost
expended on those programs – on those ships."), Id. at 259:2-6,
Appx. p. 0561 (the Navy paid Northrop "the full value" of $795M,
including $277 apparently in Katrina impacts), Id. at 302 (Northrop
did not lose any money on LPD 21).  Exh. 2J, Spiker Depo., 159:9-
21, Appx. p. 0617 (cost impacts, including overhead and level of
effort, for LPDs 18-20 were paid by the Navy).

     Indeed, under such contracts, Northrop would never lose sales
when it loses production capacity so long as it did not lose the
contract entirely.  "Because Northrop always completes its

contracted-for work, FM's arguments would result in Northrop never
having any coverage for Time Element losses, including its $387
million Time Element loss here."  (Northrop Cross-Reply at 1.)

Northrop thus argues that its loss should be measured not by
considering whether a given contract was fully satisfied, since all
contracts are satisfied, but by determining the difference between
Northrop's expected and actual profits.  This was the method used
by Northrop's expert Cheryl LeeVan to determine Northrop's Time
Element loss.  In her expert report, LeeVan explains that she
employed a "But For measurement," according to which she determined
(1) "the profits Northrop expected to earn during a specific
Recovery Period" had Katrina not occurred, (2) "Northrop's actual
profits during this period," and (3) "the difference between
expected and actual profits, less the impacts to profits caused by
non-Katrina events."  (LeeVan Report at 23-24.)  In other words,
Northrop is asking for its loss to be measured by reference to
Northrop's Annual Operating Plan and percentage of completion
accounting practices.

Northrop argues that this measure is more correct than Factory
Mutual's measure.  Factory Mutual stated that "Northrop's gulf
coast manufacturing operations essentially consist of the sale of
skilled labor hours to build ships.  The labor hours charged to
each vessel form the basis of Northrop's net sales value of
production."  (Factory Mutual Supp. Brief. at 6.)  Northrop rejects
this characterization of its operations.  "The Navy does not pay
some uniform 'sales value' that can be multiplied by hours
incurred.  Rather, the Navy pays for the progress made in
completion of physical ship production achieved during a given

period, according to the price and shareline agreed in the contracts.  Once lost, it is never recouped in that period or in any reasonable period thereafter."  (Northrop Cross-Reply at 4.) Northrop asserts that its "net sales value is based on the percentage of completion of a given ship at a given time, not the number of labor hours it incurs.  Northrop measures, under GAAP, its Gross Earnings and loss of Gross Earnings based on the percentage of completion - a measure that the Navy accepts, too." (Id.)

### c. Discussion

The court finds that Northrop has presented evidence establishing an issue of fact as to whether it has shown an actual loss on LPDs 18-21.  The court agrees with Northrop that in the context of this industry and type of contract, requiring a loss of sales as well as lost production would undermine the Business Interruption insurance that Northrop purchased from Factory Mutual. "[T]he purpose and nature of 'business interruption'. . . insurance is to indemnify the insured against losses arising from his inability to continue the normal operation and functions of his business, industry, or other commercial establishment." Pac. Coast Eng'g Co. v. St. Paul Fire & Marine Ins. Co., 9 Cal. App. 3d 270, 275 (Ct. App. 1970)(internal citations omitted).  Northrop's operations were shut down or impaired for a certain period,[4] and Northrop has presented evidence of its calculation of lost gross earnings.  It will be up to the factfinder to determine the

---

[4] The parties appear to dispute the relevant Period of Liability, but that issue is not before the court in this Motion.

credibility of the particular method Northrop used and the accuracy of its calculations.

Factory Mutual's interpretation of the "net sales value of production" includes a requirement that Northrop demonstrate specific lost sales, not simply lost production.  The court finds that Factory Mutual's interpretation does not take into account the nature of the contracts in question, namely, long-term ship building contracts.  The cases Factory Mutual cites involve traditional manufacturing operations, in which production and sales are linked together in a more direct way than in the cost-plus contracts entered into by Northrop and the Navy.  In the cited cases, the primary concern of the courts was to prevent double recovery on the part of the insured.

For instance, in Northwestern States Portland Cement Co. v. Hartford Fire Insurance Co., 360 F.2d 531 (8th Cir. 1966), a cement company lost its ability to produce clinker, the blended mixture of powdered limestone and clay used to make cement, in one of its two plants, due to a fire.  The company attempted to recover time element loss for the value of 120,044 barrels of cement that it could have produced using the 115,242 barrels of clinker that it was unable to produce during the 33 days it was closed.  The court found that the company could not recover merely for the lost production, because it had on hand a large inventory of finished cement, which it continued to sell, and of stockpiled clinker, which it continued to use in the grind department of the partially shut down plant.  As a result, the company sustained no loss of sales, since between the stockpiled cement and the cement generated from the stockpiled clinker it sold its usual amount of cement

during the period of closure.  The court held that if the company were to recover the amount it requested, it "would be in a better position than if no shutdown had occurred," since the company was able to sell the same amount of cement as it would have but for the fire.  See also Lyon Metal Prods., LLC v. Prot. Mut. Ins. Co., 321 Ill. App. 3d 330 (Ill. App. 2001)(holding that an insurance company could offset from the business interruption claim the amount the insurance had paid for damaged inventory under the property damage provision).

Here, in contrast, there is no question of double recovery. There is no suggestion that Northrop had stockpiles or any other resources that it could use to make up for its loss.  The fact that Northrop ultimately fulfilled its contract with the Navy does not make the situation analogous to the cement company fulfilling its projected sales during the time of the plant closure; Northrop has one client - the Navy - and each single contract is a massive undertaking extending over several years.

Given the nature of the business, the fact that it did not lose a particular sale of a particular ship therefore does not mean that it did not lose earnings.  This case is distinguishable from Fold-Pak Corp. v. Liberty Mut. Fire Ins. Co., 784 F.Supp. 49 (W.D.N.Y. 1992), where a food pail company's business interruption was rejected because the company had not presented evidence of unfilled orders or its inability to meet the needs of customers due to its loss of production.  Here, all of Northrop's operation is directed at a single client, and because of the nature of the contracts, Northrop, the Navy, and the regulations governing federal contractors have developed cost-plus contracts adapted to

the particular context.  These contracts call for an accounting method that takes into account the long term nature of the contracts.  Thus, although important components of Northrop's accounting method - such as its calculation of the period of liability, the appropriate deductions for equipment upgrades, the calculation of non-continuing expenses, and the other problems Factory Mutual asserts in its papers (see in particular Factory Mutual's Cross-Reply 3-5) - may be disputed at trial, the percentage of completion accounting, as opposed to strict loss of sales, is an appropriate framework on which to determine the actual loss, given the nature of the industry.  Northrop cannot be required to demonstrate loss on the model of a traditional manufacturing business when its contracts are of a different nature.

The language of the Excess Policy does not foreclose the possibility of using calculation of actual loss based on the percentage of completion accounting method.  Northrop can show "net sales value of lost production" through its percentage of completion accounting method.  Requiring the type of calculation proposed by Factory Mutual would effectively nullify the business interruption insurance that Northrop purchased.  See MacKinnon v. Truck Ins. Exch., 31 Cal. 4th 635, 654 (2003)(rejecting insurer interpretation that "would fundamentally undermine" the purpose of a policy by "cutting a broad and arbitrary swath through [its] protections").

The court finds that Northrop has met its burden in establishing an issue of fact on its actual loss on the LPD 18-21 ships and DENIES summary judgment.

**V. CONCLUSION**

For the reasons stated above, the court GRANTS summary judgment in favor of Northrop with respect to the offset of the tax credit and DENIES Northrop summary judgment with respect to the Navy payments.  The court GRANTS Factory Mutual's Motion for a declaration that under the Policies (1) Time Element loss not directly resulting from physical loss or damage is not covered under the Excess Policy, and (2) it is Northrop's burden to establish this causal link with respect to all of its claimed Time Element losses.  The court DENIES Factory Mutual's Motion regarding LPDs 18-21.

IT IS SO ORDERED.


Dated: July 31, 2013

DEAN D. PREGERSON

United States District Judge